Marvin W. STEINKUEHLER, Marilyn Steinkuehler, M. Dwain Steinkuehler and W. Pearl Steinkuehler, husband and wife, and Linda Coward and Jack Coward, wife and husband, Appellees,

v.

HAWKINS OIL AND GAS, INC., Appellant.

No. 63553.

Court of Appeals of Oklahoma, Division No. 4.

May 20, 1986.

Rehearing Denied July 21, 1986.

Certiorari Denied Nov. 12, 1986.

John Board, Guymon, for appellees Marvin W. Steinkuehler and Marilyn Steinkuehler.

Richard K. Books, Donna N. Blakley, Watson & McKenzie, Oklahoma City, for appellees M. Dwain Steinkuehler, W. Pearl Steinkuehler, Linda Coward and Jack Coward.

J. Douglas Mann, Lloyd S. Markind, Rosenstein, Fist & Ringold, Tulsa, for appellant.

STUBBLEFIELD, Presiding Judge.

Plaintiffs, Marvin and Marilyn Steinkuehler, and intervenors, M. Dwain and Pearl Steinkuehler and Linda and Jack Coward (Lessors), are record title owners of undivided surface interests and mineral rights of the following real estate:

> The Southeast quarter (SE/4) of section fifteen (15), township five (5) North, range eleven (11) E.C.M., Texas County, Oklahoma.

Lessors brought this action against Cities Service Oil Company and Hawkins Oil and Gas, Inc., seeking judgment that the oil and gas leases granted by them to Cities Service had terminated and to quiet their title against any claim of Cities Service and/or Hawkins.

Lessors had granted oil and gas leases for a term of three years to Cities Service, which farmed out the leases to defendant Hawkins. The expiration date of the primary term was December 27, 1982.

On November 11, 1982, Hawkins filed with the Oklahoma Corporation Commission a notice of intention to drill a well designated as Steinkuehler No. 1–15. Hawkins commenced operations on December 18, 1982, and the initial hole was spudded on December 21, 1982, with the target depth being the Chester formation at an approximate total depth of 6,100 feet. However, circulation in the well was lost between 4,839 feet and 4,988 feet, and the drill pipe became stuck. When attempts were made to free the drill pipe, the washover pipe also became lodged in the same zone. All efforts to correct the situation were unsuccessful. Hawkins filed with the Corporation Commission a required form which classified Steinkuehler No. 1–15 as "P & A'd—Lost Circ.," and which indicated that drilling was finished on January 2, 1983. A plugging record indicated that the "Character of Well" was "Dry (lost circ.)" and, according to the daily drilling reports,

plugging was completed on January 4, 1983.

Hawkins paid additional monies to Lessors as compensation for surface damages caused by expansion of the perimeter of the drilling site and filed with the Corporation Commission a second notice of intention to drill what was designated as Steinkuehler No. 1–15A, at an "AMENDED LOCATION DUE TO JUNKING & ABANDONMENT," on January 4, 1983. On that same date, Hawkins skidded the rig approximately fifty feet from the initial hole and drilling was continued on January 5, 1983. This new hole, Steinkuehler No. 1–15A, was completed as a "commercial producer of oil and gas" at a depth of 5,943 feet in the Morrow Purdy formation. The drilling rig was released on January 19, 1983, a completion rig moved in on January 20, 1983, and the completion rig released on February 3, 1983.

After Hawkins had been informed that Lessors were planning to file an action to cancel the lease, it filed what it terms a "curative" pooling action with the Corporation Commission for the purpose of acquiring all potentially unleased interests in and to the subject property. Although the well produced oil for seven days near the end of January and first of February and a pipeline corporation picked up oil production on February 16, 1983, Hawkins ceased final well-completion operations and oil production until Lessors had made their election. Oil production was recommenced on a regular basis on May 12, 1983.

On March 7, 1983, Lessors filed this action against Cities Service and Hawkins to cancel the leases and to quiet Lessors' title in the mineral interest, alleging that the leases had terminated under their express terms when Hawkins plugged and abandoned Steinkuehler No. 1–15 after the expiration of the primary term of the leases.

Hawkins maintained that commencement of drilling on Steinkuehler No. 1–15 was accomplished within the primary term of the leases; the initial hole had not been drilled to completion because technical difficulties beyond its control were encoun-

tered during drilling operations; the skidding of the rig and completion of a well through a second bore hole constituted the completion of a single well; and the terms of the leases provided that it had "the right to drill such well to completion with reasonable diligence and dispatch." Therefore, Hawkins moved for summary judgment upon the basis that, as a matter of law, the leases were extended and preserved by its commencement of a well within the primary term and its completion of the well in a prudent manner without delay.

Lessors subsequently dismissed with prejudice their claim against Cities Service and moved for summary judgment against Hawkins. The trial court overruled Hawkins' motion for summary judgment and granted summary judgment to Lessors, and it is from this order that Hawkins appeals.

## I

On appeal Hawkins complains of the trial court's characterization of the leases as completion rather than commencement leases. The disputed lease provision reads:

> This lease may be maintained during the primary term hereof without further payment or drilling operations. If the lessee shall commence to drill a well within the term of this lease or any extension thereof, the lessee shall have the *right to drill such well to completion with reasonable diligence* and dispatch, and if oil or gas, or either of them, be found in paying quantities, this lease shall continue and be in force with like effect as if such well had been completed within the term of years first mentioned. (Emphasis added.)

■ The trial court's characterization of the leases executed by Lessors as "completion type" does seem directly contrary to the clear language of the instruments. A completion type drilling clause mandates that a well must be completed, as opposed to commenced, during the primary term in order to keep the lease alive into the secondary term. *State ex rel. Commissioners of Land Office v. Carter Oil Co.*, 336

P.2d 1086, 1090 (Okla.1958). *See also, Moncreif v. Pasotex Petroleum Co.*, 280 F.2d 235 (10th Cir.1960); 8 H. Williams & C. Meyers, *Oil and Gas Law* 146 (1984). On the other hand, a commencement type drilling clause in an oil and gas lease provides that the lease will not terminate during the diligent continuation of drilling operations which were commenced within the primary term. *Carter Oil Co.*, 336 P.2d at 1090; *Moncreif*, 280 F.2d at 235; 2 E. Kuntz, *The Law of Oil and Gas* § 26.13 at 314 (1964).

■ Here the clear unambiguous language of the leases provides that commencement of a well within the primary term, the completion of the well with reasonable diligence and dispatch, and production in paying quantities would hold the lease. The parties, in fact, agree that a well commenced during the primary term could have been drilled to completion after the expiration of the primary term.

Thus, the finding of the trial court that the leases represent "completion type oil and gas leases" is contrary to the clear provisions of the lease, as well as the parties' own characterization. We hold that the leases under the provisions of which Hawkins was operating are commencement leases, and that the commencement of a well during the primary term was sufficient to keep the leases alive into the secondary term so long as drilling operations were prosecuted with reasonable diligence, and oil thence produced in paying quantities.

## II

■ The paramount issue is whether a second penetration of the surface, after the initial bore hole has been damaged beyond reclamation and the rig skidded, constitutes continuous drilling operations of a single well or commencement of a new well after "completion" of the first well.

"[A] well is not regarded as completed until it has been drilled to the depth at which oil and gas is usually discovered in the vicinity." 8 H. Williams & C. Meyers,

*Oil and Gas Law* 143 (1984). When used in a lease requiring commencement, "the word 'completion' means a well drilled to the specified sand or depth, and such means known to the industry have been employed to produce oil 'to the extent that a reasonably experienced driller would use' to make a producing well of a non-producing well." *Edwards v. Hardwick,* 350 P.2d 495, 500 (Okla.1960), *quoting from Howard v. Hughes,* 294 Mich. 533, 539, 293 N.W. 740, 743 (1940). A "dry hole" is a hole that has been drilled to the structure or formation which had been believed to have favorable prospects, and such hole did not result in the discovery of minerals. 4 E. Kuntz, *The Law of Oil and Gas* § 47.2 (1964). However, a well is not "regarded as a 'dry hole' until it is a completed well." 8 H. Williams & C. Meyers, *Oil and Gas Law* 255 (1984).

In *Skelly Oil Co. v. Wickham,* 202 F.2d 442 (10th Cir.1953), a well in Stephens County, Oklahoma, was drilled to a depth of 5,796 feet when drilling was voluntarily suspended. Acting upon the recommendation of a geologist, who had compared and correlated information obtained through samples and data from its well with information and data of other wells in the vicinity, Skelly, the lessee, abandoned the well in question as a dry hole. Skelly then proceeded, after the primary term had expired, to drill a second but commercially productive well. The court found that:

> [T]he only unconditional right Skelly had under the lease, after expiration of the primary term, was to complete the well it had commenced before such expiration; that any further rights Skelly might acquire under the lease were contingent and conditional, in that they were dependent upon the completion of the well as a commercial producer; and that when the well was completed as a dry hole Skelly's rights under the lease wholly terminated.

*Wickham,* 202 F.2d at 446. Clearly, when Skelly determined from scientific data that the first well entered no formations which were likely to contain oil and/or gas and instructed the drilling contractor to abandon the well as a dry hole, it abandoned a "completed well." *Wickham,* 202 F.2d at 443.

However, the instant case is distinctly different from *Wickham.* The contract depth in the farm-out agreement was the Chester formation, which was estimated to be at 6,100 feet. Hawkins suspended drilling operations in the initial hole when it lost circulation, efforts to regain circulation were unsuccessful, and "fishing" efforts were fruitless in retrieving the stuck drill and washover pipes. The drilling operations in the initial hole, Steinkuehler No. 1–15, did not cease because there were no formations productive of oil and/or gas as was the case in *Wickham.* Therefore, when Steinkuehler No. 1–15 was plugged and abandoned on January 4, 1983, after diligent efforts to salvage the initial bore hole were unsuccessful, it was not because it was a "completed well" which was a "dry hole."

In *Amarex, Inc. v. Baker,* 655 P.2d 1040 (Okla.1982), the Oklahoma Supreme Court was presented with the precise issue faced by this court. Amarex began drilling operations and after drilling to a depth of 416.-25 feet, the surface casing broke off in the bore hole. Attempts to save the hole were unsuccessful and further efforts would have been economically infeasible. Thereafter, Amarex skidded the rig from the initial bore hole and recommenced drilling operations. The non-operating interest holders claimed that their election to participate in "the well covered hereby" did not extend to the second bore hole. *Amarex,* 655 P.2d at 1042. The court, in overruling the finding of the Oklahoma Corporation Commission that drilling the second bore hole constituted drilling an "additional, replacement, or twin well," held that:

> [T]he continuous operation in the drilling of a well, during which the operator lost the initial hole, skidded the rig six feet from the initial hole and drilled to a depth of 416.25 feet, and continued drilling operations is merely an incident in the drilling of the well and does not constitute a new well. So long as the

surface location of the borehole is not otherwise so precisely defined and limited, the drilling of a well consists of penetrating the earth from the surface to the prescribed depth with drilling equipment. Minor vertical or horizontal variations do not convert the operation to a new well, whether such variations occur at the surface of the earth or beneath it. The finding of the Commission that a new well was commenced was therefore not supported by substantial evidence and must be reversed.

*Amarex,* 655 P.2d at 1045.

In this case, although the farm-out agreement and the operating agreement specified a precise location, it is notable that the leases at issue did not dictate a specific location, drilling depth, or target formation for "a well." A minor horizontal variation in drilling, therefore, would not constitute a new well. So long as the move of the rig and the continuation of drilling operations were done with dispatch, such actions were merely a continuation of the same well and the leases continued in effect. The facts here clearly show Hawkins acted with reasonable diligence and dispatch, and that conclusion is not seriously controverted by Lessors.

The trial court seems to have been most swayed by certain actions of Hawkins as indicating its belief that the two wells were separate and distinct. The trial court specifically found that:

3. The evidence demonstrates that HAWKINS considered the Steinhuehler No. 1–15 well and the Steinkuehler No. 1–15A well to be separate and distinct wells.

4. Subsequent to the expiration of the primary term of the subject leases and following the abandonment of the Steinkuehler No. 1–15 well, HAWKINS forced pooled the mineral interest of the Plaintiffs and Intervenors under Oklahoma Corporation Commission Order No.

236757. Pursuant to the provisions of said Order, the Plaintiffs and Intervenors elected to receive, and are entitled to receive, in addition to a normal ⅛ royalty interest as defined in 52 O.S., Section 87.1(e), an overriding or excess royalty of ⅛ of ⅝ on oil and casinghead gas and ⅛ of ⅞ on gas and gas condensate from the date of first production from the Steinkuehler No. 1–15A well.

Aside from the pooling proceedings, the only evidence of what Hawkins "considered" was its action in plugging the well and reporting this action to the Corporation Commission.[1] This court takes judicial notice of the fact that the Corporation Commission has established procedures with which all oil and gas drilling operators must comply. Such compliance with Commission requirements cannot be construed to show that Hawkins "considered Steinkuehler No. 1–15 and Steinkuehler No. 1–15A to be separate and distinct wells." On the contrary, the filing of notice of intent to drill at an "amended location due to junking and abandonment" of the initial site is a clear indication that Hawkins was pursuing the first and only well through a second bore hole.

Likewise, the pooling action by Hawkins was not indicative of any belief regarding the status of the well or wells. This action was taken only after notification that a lawsuit would be filed to cancel the leases, and was an obvious safeguard procedure to protect Hawkins' interest in the well in the event the leases were cancelled. The action may have indicated Hawkins' lack of confidence in its legal position, but this subsequent action, of course, could not be indicative of Hawkins' earlier intent when it skidded the rig a short distance and continued drilling through a new bore hole.

All of the evidence supports a finding that the first hole was abandoned solely because of the technical difficulties encoun-

---

1. Hawkins did send a mailgram to "non-operators" notifying them of Hawkins' intent to skid the rig and of the obvious increase in well costs. These parties were asked to indicate whether they were willing to continue their partic- ipation. This act seems to support Hawkins' argument that the second hole was a continuation of the first hole, and that both constituted only one well.

tered—difficulties which made it almost physically impossible and certainly economically infeasible to continue operations in the same hole. Under the clear holding of *Amarex*, when the initial bore hole was lost due to such technical difficulties and through no negligence in the drilling operations, and where prompt action was taken to pursue that well through a second bore hole, there was no cessation of operations and no intent to abandon operations. Likewise, there was no commencement of drilling of a second well because drilling operations on the second hole were an integral part of a singular attempt to drill to the target depth.

The order and judgment of the trial court is reversed, and the case is remanded with instructions to enter judgment in favor of Hawkins.

BRIGHTMIRE and RAPP, JJ., concur.