**Jack McCLAIN, Plaintiff/Appellant,**

**Joe K. Lester, Plaintiff,**

**Fred Rick Opitz, Personal Representative of the Estate of Fred Opitz, and Ben McClain, Plaintiffs/Appellees,**

v.

**RICKS EXPLORATION COMPANY, Sanguine Ltd., Cotton Petroleum, Inc., now Oxy USA, Inc., Hal French, Inc., Longhorn Energy Corporation, Fossill Oil and Gas, Inc., Meyer–Moran Revocable Trust, Dale Cheek, Ran Ricks, Jr., Jerral W. Jones, Don H. Nelson, Ruth K. Nelson, R. Faye Tucker, Gerald Neff, Karen J. Williamson, V.M. Thompson, Jr., Nicor Exploration Company, Sun Oil Company, now Oryx Energy Company, King**

---

1. *McCormick v. State,* 845 P.2d 896, 902–3 (Okl. Cr.1993).

2. *McCormick,* 845 P.2d at 903.

Resources Company, Ozark–Mahoning Company, now Elf Atochem North America, Inc., F. Howard Walsh, Jr., George B. Kaiser, Mel Abend, Francis Oil & Gas, Inc., John Athens, 2264 Company, Ltd., Joseph L. Parker, Jr., Leonard Klein, Joseph Gentry, Melvin Moran, Sidney Moran, Ronald Allen, Phoenix Resources Company, Getty Oil Company, now Texaco Producing, Inc., Connie Cheek, El Paso Natural Gas Company, American Natural Gas Production Company, Defendants/Appellees.

Fred Rick OPITZ, Personal Representative of the Fred Opitz Estate and Ben McClain, Plaintiffs/Appellees,

v.

Jack McCLAIN and Joe K. Lester, Plaintiffs,

Ricks Exploration Company, Hal French, Inc., Longhorn Energy Corporation, Dale Cheek, Ran Ricks Jr., Jerral W. Jones, Don H. Nelson, Ruth K. Nelson, R. Faye Tucker, Gerald Neff, Karen J. Williamson, V.M. Thompson, Jr., Nicor Exploration Company, King Resources Company, Ozark–Mahoning Company, now Elf Atochem North America, Inc., F. Howard Walsh, Jr., George B. Kaiser, Mel Abend, John Athens, 2264 Company, Ltd., Joseph L. Parker, Jr., Leonard Klein, Joseph Gentry, Ronald Allen and Phoenix Resources Company, Defendants/Appellants,

Sanguine, Ltd., Cotton Petroleum, Inc., now Oxy USA, Inc., Fossil Oil & Gas, Inc., Meyer–Moran Revocable Trust, Sun Oil Company, now Oryx Energy Company, Francis Oil & Gas, Inc., Melvin Moran, Sidney Moran, Getty Oil Company, now Texaco Producing, Inc., Connie Cheek, El Paso Natural Gas Company and America Natural Gas Production Company, Defendants.

Fred Rick OPITZ, Personal Representative of the Fred Opitz Estate and Ben McClain, Plaintiffs/Appellees,

v.

GETTY OIL COMPANY, now Texaco Producing, Inc., Defendant/Appellant.

Fred Rick OPITZ, Personal Representative of the Fred Optiz Estate and Ben McClain, Plaintiffs,

v.

HAL FRENCH, INC., Longhorn Energy Corporation, Dale Cheek, Ran Ricks, Jr., Jerral W. Jones, Don H. Nelson, Ruth K. Nelson, R. Faye Tucker, Gerald Neff, Karen J. Williamson, V.M. Thompson, Jr., Nicor Exploration Company, King Resources Company, Ozark–Mahoning Company, now Elf Atochem North America, Inc., F. Howard Walsh, Jr., George B. Kaiser, Mel Abend, John Athens, 2264 Company, Ltd., Joseph L. Parker, Jr., Leonard Klein, Joseph Gentry, Ronald Allen and Phoenix Resources Company, Defendants/Appellants,

Ricks Exploration Company, Sanguine, Ltd., Cotton Petroleum, Inc., now Oxy USA, Inc., Fossil Oil & Gas, Inc., Meyer–Moran Revocable Trust, Sun Oil Company, now Oryx Energy Company, Francis Oil & Gas, Inc., Melvin Moran, Sidney Moran, Getty Oil Company, now Texaco Producing, Inc., Connie Cheek, and American Natural Gas Production Company, Defendants.

Nos. 80954, 80943, 80947, 80948 and 81–115.

Court of Appeals of Oklahoma, Division 1.

May 10, 1994.

As Amended on Limited Grant of Rehearing; Rehearing Petitions Otherwise Denied July 5, 1994.

Certiorari Denied Nov. 2, 1994.

**426**

Justus Hefley, Anadarko, for appellant Jack McClain.

Karl F. Hirsch, Patricia G. Parrish, Glenn M. White, Oklahoma City, for appellants Hal French, Inc., et al.

James M. Chaney, Thomas J. Daniel, IV, Oklahoma City, for appellant Ricks Exploration Co.

James R. Waldo, Oklahoma City, for appellant Getty Oil Co., now Texaco Producing, Inc.

Justus Hefley, David A. Stephens, Anadarko, for appellees Fred Rick Opitz, Personal Representative of the Estate of Fred Opitz, and Ben McClain.

*OPINION*

HANSEN, Judge:

This action is a consolidated appeal consisting of five separate appeals, with four separate appellants.[1] Plaintiffs, Fred Rick Opitz, Personal Representative of the Estate of Fred Opitz ("Opitz"), Ben McClain and Jack McClain, mineral owners, brought this action to cancel oil and gas leases granted by them on mineral interests owned by them in Section 24, Township 11 North, Range 12 West, Caddo County, Oklahoma. Plaintiffs also sought to quiet title and to receive punitive damages for Defendants' bad faith trespass. After a six-day, non-jury trial held over ten years after this action was instituted, the trial court cancelled the oil and gas leases and quieted title in the leasehold in Plaintiffs Opitz and Ben McClain. The action was dismissed as to Plaintiffs Jack McClain and Joe K. Lester because Jack McClain sold his entire mineral interest in 1989 to Lester, who in turn, sold such interest to Defendant Ricks Exploration Company (hereinafter "Ricks"). The trial court determined Defendants were not trespassers and denied punitive damages.

Each Plaintiff owned an undivided 10 acre mineral interest in the SE/4 of Section 24. Section 24 is a 640–acre drilling and spacing unit for the production of hydrocarbons from the Oswego, Springer and other common sources of supply. In 1974, the McClains' predecessor in interest granted an oil and gas lease on his 10 acre interest to Defendant Getty Oil Company (Getty). This lease had a five-year primary term from April 10, 1975, thus it expired on April 10, 1980. In 1974, Fred Opitz granted an oil and gas lease to Getty covering his interest in the SE/4 of

1. 1. Appeal No. 80,943 was brought by Defendant Getty Oil Company against Plaintiffs Fred Rick Opitz, P.R. of the Estate of Fred Opitz, and Ben McClain.

2. Appeal No. 80,948 was brought by Defendants Hal French, Inc., Longhorn Energy Corporation, Dale Cheek, Ran Ricks, Jr., Jerral W. Jones, Don H. Nelson, Ruth K. Nelson, R. Faye Tucker, Gerald Neff, Karen J. Williamson, V.M. Thompson, Jr., Nicor Exploration Company, King Resources Company, Ozark Mahoning Company, now Elf Atochem North America, Inc., F. Howard Walsh, Jr., George B. Kaiser, Mel Abend, John Athens, 2264 Company, Ltd., Joseph L. Parker, Jr., Leonard Klein, Joseph Gentry, Ronald Allen, and Phoenix Resources Company, hereinafter collectively *"The French Group"*, against Plaintiffs Fred Rick Opitz, P.R. of the Estate of Fred Opitz, and Ben McClain.

3. Appeal Nos. 80,947 and 81,115 were brought by The French Group and Defendant Ricks Exploration Company, hereinafter *"Ricks"*, against Plaintiffs Fred Rick Opitz, P.R. of the Estate of Fred Opitz, and Ben McClain.

4. Appeal No. 80,954 was brought by Plaintiff Jack McClain against Ricks, The French Group and the other named Defendants.

Section 24. This lease similarly provided for a five-year primary term from April 10, 1975.

On November 20, 1978, Defendant Sanguine entered into a joint operating agreement with the other owners of leasehold interests in Section 24 for the drilling of a well in the SW/4 of Section 24, the # 1 Mills. The agreement provided Sanguine would be the operator of the well *until completion*. At completion, Ricks would take over operations. Sanguine's Notice of Intent to Drill to the Morrow–Springer formation for the Mills well was approved by the Oklahoma Corporation Commission (Commission) one week later. The Mills well was spuded on November 29, 1978. In January, 1979 the Commission entered an order pooling the Oswego, Springer and other formations underlying Section 24. Getty elected not to participate, reserving an overriding royalty interest in exchange for its interest in these formations. In March, 1979, total depth of 14,303 feet was reached for the Mills well. While attempting to perforate the Springer Sand, the driller lost the perforating gun in the hole. Fishing tools were also lost in the hole. The well continued to experience problems caused by the retrieval of the equipment. After re-perforation of the Springer, the well tested 2.1 MMCFGPD on May 25, 1979 and Sanguine filed a well completion report with the Commission on July 9, 1979.[2] On May 30, 1979, until March 19, 1980, the Mills well was waiting for an Arkla Pipeline connection.[3]

After the Mills well was connected on March 19, 1980, it sporadically flowed and froze up. The driller continued to work on the well every day. The day before the primary term of Plaintiffs' leases expired, the well flowed 520 MCFGPD with a flow tubing pressure of 700 PSI. An Arkla gas meter statement for April, 1980 shows the Mills well produced 7,668 MCF from April 9th through April 30th. On April 29, 1980, the well died. One month later, Ricks commenced a workover of the well which continued on a daily basis until December 24, 1980. The recompletion attempts in the Springer formation failed and by January, 1981, Ricks decided to move uphole to recomplete the well to establish production. On January 24, 1981, the driller perforated the Oswego formation and on February 12, 1981, the well was again hooked up to the pipeline. The well produced from the Oswego until November 6th, 1981, when the Mills well permanently ceased production.

While the Mills well was producing in 1981, Sanguine had applied for and received a pooling order for a well in the NE/4 of Section 24. The pooling application indicates the well would be an "in lieu" well to test the same formations pooled for the Mills well.[4] The in lieu well, the "Elliott", was spud on June 22, 1981 and completed as a prolific gas producer from the Springer formation on November 14, 1981. The completion of the Elliott well came roughly one week after the

**2.** The trial court found this test information contained in the 1981 *amended* completion report on the Mills well was false. The trial court determined the 1981 amended completion report should have shown the *Prue* formation was perforated and tested only 400 MCFGPD.

**3.** On April 27, 1979, Sanguine and Arkla executed a gas purchase contract which required Sanguine to pay "all royalties, overriding royalties, production payments and other payments of whatever kind". This contract was amended in June 15, 1979 to cover the Mills well. On March 2, 1982, this contract was further amended to

cover the Elliott well, which was drilled in the NE/4 of Section 24 in 1981.

**4.** The Corporation Commission approved the application in Cause No. 82,664 by Order No. 194903, dated July 27, 1981. At the time of the Order, the Elliott was at approximately 6,000 feet. Section 24 was still spaced for the production of gas at 640 acres: the Section was not despaced. Although the Plaintiffs argue the Elliott was not a "replacement well", the evidence clearly shows the Commission approved the Elliott as an "in lieu" well, that is, to *replace* the Mills well.

Mills well ceased production permanently. The Elliott well paid out in August, 1982. In July, 1983, Plaintiffs filed this action seeking cancellation of their leases.

Before reviewing the questions appealed concerning the cancellation of the leases, we will dispose of Plaintiff Jack McClain's sole contention on appeal. As earlier noted, Jack McClain was the owner of an undivided 10 mineral acres in the SE/4 of Section 24. However, on June 5, 1989, he conveyed this interest to Arrowhead Resources, Inc., effective June 1, 1989. On June 20, 1989, Arrowhead conveyed the 10 acres to Plaintiff Joe K. Lester, effective June 1, 1989. At the beginning of trial, Lester announced he had sold his interest to the Defendant Ricks. The trial court determined Jack McClain and Joe Lester's claims were wholly owned by Ricks and therefore no cause of action remained to be litigated regarding these two parties' interests. Jack McClain contends the trial court erred by not awarding him production income with interest through the date of the transfer, June 1, 1989.

The standard form, preprinted mineral deed from Jack McClain to Arrowhead conveys McClain's 1/16th mineral interest in the SE/4. Directly below the legal description of the land, these typewritten words appear:

It is the intention of the Grantor herein, to convey an undivided 10.0 net mineral acres in the above described lands. The effective date is June 1, 1989.

Below this language, in preprinted language the mineral deed provides:

Notwithstanding, it is the specific intent of this instrument to convey all right, title, and interest in the above described property to the Grantee. Said Grantee, to receive all bonuses, rents, royalties, production payments, or monies of any nature *accrued in the past or future.* It is further understood that this conveyance is a transfer of production payments and pooled acreage benefits to the Grantee. * * *

(Emphasis added.)

Plaintiff Jack McClain argues the typewritten language controls over the printed portion of the deed and that the typewritten language indicates he did not intend to convey production which had accrued prior to June 1, 1989. McClain is correct that where a contract is partly written and partly printed, the written parts control over the printed parts. 15 O.S.1991, § 167; *Griffin Grocery Co. v. Carson Grocery Co.,* 174 Okla. 96, 50 P.2d 368 (1935). However, this rule of construction is only utilized in the event the written provisions conflict with the preprinted provisions. Where a contract is complete in itself and, as viewed in its entirety, is unambiguous, its language is the only legitimate evidence of what the parties intended. *Mercury Investment Company v. F.W. Woolworth Company,* 706 P.2d 523, 529 (Okla. 1985). The intention of the parties cannot be determined from the surrounding circumstances but must be gathered from the four corners of the instrument. *Id.;* 15 O.S.1991, §§ 154, 155.

We agree with the trial court's determination that the mineral deed is not ambiguous. The sentence which provides the effective date of the conveyance is June 1, 1989, does not modify or create an ambiguity regarding the language which conveys all McClain's interest in production payments "accrued in the past or future". The typewritten language simply provides an effective date for the conveyance, it does not modify the extent of the interest conveyed. Accordingly, this assignment of error is overruled.

The next five issues on appeal involve the trial court's determination the Mills well ceased production in paying quantities and on that basis, cancelled the leases. The various Defendant/Appellants maintain the Mills well produced in paying quantities from the Springer formation, produced in paying quantities from the Oswego formation, and that any lapse in the production of paying quantities from the Mills well was reason-

able, thus the leases were saved under the doctrine of temporary cessation. They further contend the Plaintiffs are estopped to seek cancellation of the leases and that equity prevents cancellation of the leases.

■■■ An action to cancel an oil and gas lease is one of equitable cognizance. *Hininger v. Kaiser*, 738 P.2d 137 (Okla.1987). The findings and decision of the trial court will not be reversed unless clearly against the weight of the evidence. *Hamilton v. Amwar Petroleum Company*, 769 P.2d 146 (Okla.1989). However, if upon an examination of the record, the judgment is clearly not sustained by the weight of the evidence, this Court may render the judgment that the trial court should have rendered. *First Nat. Bank of Anadarko v. Orme*, 125 Okla. 114, 256 P. 748 (1926).

■■■ Plaintiffs admit the leases they executed are "commencement" leases.[5] As such, the leases will not terminate during the "diligent continuation of drilling operations which were *commenced* within the primary

term". (Emphasis supplied.) *Steinkuehler v. Hawkins Oil and Gas, Inc.*, 728 P.2d 520 (Okla.App.1986). Thus, Plaintiffs' contention the Mills well was not "completed" in the primary term is of no consequence. Under a commencement lease, the operator is not required to *complete* a well in the primary term.[6] The evidence is undisputed the Mills well was commenced and actually produced some gas during the primary term. The trial court's finding the Mills well was not capable of production in paying quantities at the end of the primary term cannot be a basis for termination of the leases. Insofar as the trial court used such finding as a basis to terminate Plaintiffs' leases, the judgment is erroneous.[7]

■■■ Plaintiffs' leases did not expire in the primary term. The only basis for determining the leases expired in the secondary term was the trial court's finding the Mills well failed to produce gas in paying quantities. In *Stewart v. Amerada Hess Corporation*, 604 P.2d 854 (Okla.1979), the Supreme

---

5. The lease clauses provide:

"If drilling operations or mining operations are not commenced on the leased premises on or before April 10, 1976, this lease shall then terminate as to both parties unless Lessee on or before the expiration of said period shall pay or tender to Lessor ... [RENTALS] ... which shall extend for twelve months the time within which drilling operations or mining operations may be commenced. Thereafter, annually, in like manner and upon like payments or tenders the commencement of drilling operations or mining operations may be further deferred for periods of twelve months each during the primary term.
* * *
If the lessee shall commence to drill a well or commence reworking operations on an existing well within the term of this lease or any extension thereof, or on acreage pooled therewith, the lessee shall have the right to drill such well to completion or complete reworking operations with reasonable diligence and dispatch, and if oil or gas, or either of them, be found in paying quantities, this lease shall continue and be in force with like effect as if such well had been completed within the term of years first mentioned."

6. Even if the leases required a well be completed in the primary term, the evidence shows Sanguine filed a well completion report with the Commission on July 9, 1979, before the expiration of the primary term. Other evidence in the record suggests, however, the operator did not consider the Mills well completed until production was obtained from the Oswego formation. (Ricks filed an amended completion report with the Commission on April 22, 1981; Sanguine's representative testified at the July 14, 1981 pooling application hearing that the Mills well was never completed in the Springer.) In fact, the trial court found in Finding of Fact No. 67, that Ricks filed an amended, rather than new completion report (after perforating the Oswego) "since the Mills well had never been completed in the Springer/Boatwright due to mechanical difficulties".

7. The trial court found "the Mills Well did not produce in paying quantities. Further the Court finds the Mills Well not capable of producing in paying quantities when the leases in question expired on April 10, 1980 and the Elliott Well does not qualify as a replacement well for the Mills Well."

Court of Oklahoma discussed the effect of a lessee's failure to maintain production in paying quantities in the secondary term of an oil and gas lease. The Court concluded the "thereafter" clause of the habendum clause is not to be regarded as a conditional limitation or determinable fee estate. *Id.*, at 858. The clause is to be regarded as fixing the life of a lease instead of providing a means of terminating it. This construction is influenced by the strong statutory policy against forfeiture. 23 O.S.1991, § 2. A lease continues in existence as long as interruption of production in paying quantities does not extend for a period longer than reasonable or justifiable in light of all the circumstances involved. *Stewart*, at 858. "Under no circumstances will cessation of production in paying quantities ipso facto deprive the lessee of his extended-term estate." *Id.* Failure of the lease to produce a profit will not in and of itself terminate the lease: "compelling equitable circumstances" may rescue the lease even when well operations are unprofitable. *Barby*, at 17. *See also State ex rel. Commissioners of the Land Office v. Amoco Production Company*, 645 P.2d 468 (Okla.1982); *Pack v. Santa Fe Minerals*, 869 P.2d 323 (Okla.1994). No distinction is made under Oklahoma law between temporary termination of production and reduction in production to the degree that the well ceases to be profitable. *Barby v. Singer*, 648 P.2d 14 (Okla.1982).

After the commencement of the Mills well in the primary term, the question then becomes one of the operator's diligence and whether the period of cessation of production is unreasonable. *Steinkuehler*, supra. Another factor to consider is the voluntariness of the cessation. *Kerr v. Hillenberg*, 373 P.2d 66 (Okla.1962); *Hunter v. Clarkson*, 428 P.2d 210 (Okla.1967). Because of mechanical difficulties, production from the Mills' Springer zone was sporadic until it ceased

completely on May 28, 1980. Three days later, the operator commenced daily reworking operations, until the well was successfully completed in the Oswego formation in January, 1981. The Mills well continued to produce gas from this zone until November, 1981. The disputed evidence at trial was whether the production from the Oswego zone was profitable. The trial court, while not specifically limiting its finding that the well was unprofitable with regard to the *Oswego* production, made the general finding the well did not produce in paying quantities. Assuming the well did not produce profitably from February, 1981, is the nine-month lapse in profitable production from the beginning of the Mills well's Oswego production until the Elliott well was completed as an undisputed highly profitable well, an unreasonable time sufficient to cancel the leases under the doctrine of temporary cessation? We hold it is not.

The evidence shows the cessation in production from the Mills' Springer to production from the Oswego was due to mechanical difficulties, was thus involuntary, and that the operator worked to increase production in the well almost every day from June, 1980 until sales resumed after completion in the Oswego zone. The operator spent over $1.7 million dollars to rework the Mills and to recomplete the well in the Oswego zone. In June of 1981, while the Mills was producing from the Oswego, the Elliott well in the NE/4 of Section 24 was spuded. In July, 1981, the operator obtained a pooling order from the Commission for the Elliott well which was to be "in lieu" of the Mills well. The Mills well went off production permanently within a matter of days before the Elliott was completed. The evidence shows Plaintiffs Ben McClain and Fred Rick Opitz knew before the Elliott well was spuded, that leases were being taken on the SE/4 and the NW/4 of Section 24.[8] Still, neither Plaintiff

---

**8.** Fred Rick Opitz knew his mother leased her interest in May, 1981 to Hal French, Inc. Ben McClain knew about the Elliott well when it was drilling and knew someone had leased from owners Norton and Mullins in the NE/4.

demanded release of their leases nor informed the operator they considered the leases to have terminated for failure to produce profitably. In fact, Plaintiff Ben McClain never asserted his claims until one year after the Elliott well completed as a great well and *paid out.* There was evidence Plaintiff Opitz considered himself to be participating in the Elliott well in July, 1982. This notice to the operator, if it can really be considered notice that Opitz considered the leases terminated, still came one month before the Elliott paid out. Sanguine and Ricks spent over $3 million dollars to drill and complete the Elliott well, and over $6.4 million dollars total to develop Section 24.

■■■ Plaintiffs are estopped to have their leases cancelled. Similar to the facts in *Thompson v. Johnson–Kemnitz Drilling Co.,* 193 Okla. 507, 145 P.2d 422 (1943), Plaintiffs knew of the drilling of the Elliott well, witnessed production and sale of the gas, and never made demand on the operator for release of their leases. Nor is there evidence Plaintiffs offered to pay their proportionate part of the drilling costs of the Elliott to the operator. Instead, they sat back and allowed Sanguine and Ricks to take all the risks on the Elliott and after the venture proved profitable, asserted a working interest in the well.[9] As stated in *Thompson,* Plaintiffs have waited too long. They were under a duty to speak within a reasonable time.

> Equity will not aid a party who, with full knowledge of the facts, and without risk to himself, stands by an unreasonable length

of time and sees another assume all the risks in an uncertain venture in which said party might have shared, and after success of the venture, seeks to share in the benefits thereof.

*Thompson,* at 425.[10]

The temporary cessation of production, either from the Mills' Springer to the Mills' Oswego, or from the Mills' Oswego to the Elliott's Springer, is not unreasonable. Further, there are compelling equitable circumstances which prevent Plaintiffs from obtaining cancellation of their leases on Section 24. Plaintiffs are not entitled to a working interest in the Elliott well. The trial court determined all Defendants who are working interest owners, including Ricks, are liable under 52 O.S.1981, § 540 to Plaintiffs for the working interest wrongfully paid to them by Ricks plus 12% interest. The judgment against the working interest owners is REVERSED. The trial court's judgment quieting title in the leases and mineral estate in Plaintiffs and cancelling their leases is REVERSED. The judgment against the overriding royalty interest owners did not have the 12% interest figure on it. The judgment against them for production payments is similarly REVERSED.

■■■ Ricks is, however, still liable to Plaintiffs for the ⅛th *royalty interest* held by Ricks in the company's suspense account. This royalty is not, however, subject to the 12% interest provided for in 52 O.S.1981, § 540.[11] The 12% interest provided in § 540

---

9. If the leases remain in force, Plaintiffs are only entitled to their ⅛th royalty. If the leases are cancelled, Plaintiffs are entitled to their ⅛th royalty plus a ⅞ths working interest on their interest in the well.

10. See also *Indian Territory Operating Company v. Bridger Petroleum Corporation,* 500 F.Supp. 449 (W.D.Okla.1980).

11. 52 O.S.1981, § 540 (renumbered by § 28, Ch. 190, O.S.L.1992 to 52 O.S.Supp.1992, § 570.10), provides in part:
 A. The proceeds derived from the sale of oil or gas production from any oil or gas well

shall be paid to persons legally entitled thereto, commencing no later than six (6) months after the date of first sale, and thereafter no later than sixty (60) days after the end of the calendar month within which subsequent production is sold. Such payment is to be made to persons entitled thereto by the first purchasers of such production. * * * Provided, however, that in those instances where such proceeds cannot be paid because the title thereto is not marketable, the purchasers of such production shall cause all proceeds due such interest to earn interest at the rate of six percent (6%) per

is in the nature of a penalty to compel compliance with § 540. *Hull v. Sun Refining and Marketing Company*, 789 P.2d 1272 (Okla.1989); *Fleet v. Sanguine, Ltd.*, 854 P.2d 892 (Okla.1993).[12] If title is unmarketable, proceeds held in suspense only accrue interest at the rate of 6%. The record shows Ricks has tendered royalty payments for production from the Mills and Elliott wells to Plaintiffs.[13] Plaintiff Jack McClain has cashed all his royalty. Plaintiffs Ben McClain and Fred Opitz each have cashed a portion of the checks but have refused the remainder. Upon refusal, Ricks placed the proceeds in suspense accounts. The title to the royalty was unmarketable. "Marketable title is defined in § 4.1 of the standards as synonymous with a perfect title or clear title of record; and is one free from apparent defects, grave doubts and litigious uncertainty, and consists of both legal and equitable title fairly deducible of record." *Hull*, at 1277. When Plaintiffs refused the tendered royalty, a legitimate question of marketability of title existed and Ricks properly placed such royalty in suspension accounts. Ricks fully complied with the requirements of § 540 regarding the *tender* of the royalty.

The trial court's judgment for such royalty is accordingly, MODIFIED to reflect 6% interest on the royalty instead of 12%.

Finally, the trial court's judgment awarding attorney fees to Plaintiffs Fred Opitz and Ben McClain as prevailing parties pursuant to 52 O.S. § 540 is reversed. This cause is remanded to the district court for a determination of attorney fees to be awarded in this action.

The judgment of the trial court is AFFIRMED IN PART, REVERSED IN PART, MODIFIED IN PART, and REMANDED.

CARL B. JONES, P.J., and ADAMS, J., concur.

annum, until such time as the title to such interest has been perfected. * * * The first purchaser shall be exempt from the provisions of this subsection and the owner of the right to drill and to produce under an oil and gas lease or force pooling order shall be substituted for the first purchaser therein where the owner and purchaser have entered into arrangements where the proceeds are paid by the purchaser to the owner who assumes the responsibility of paying the proceeds to persons legally entitled thereto.

B. Any said first purchasers or owner of the right to drill and produce substituted for the first purchaser as provided herein that violates this act shall be liable to the persons legally entitled to the proceeds from production for the unpaid amount of such proceeds with interest thereon at the rate of twelve percent (12%) per annum, as the penalty.

\* \* \* \* \* \*

12. We disagree with Ricks that there was no "arrangement", as that term is used in 52 O.S. 1981, § 540, between the first purchaser and Ricks for the distribution of proceeds. The joint operating agreement, executed by Sanguine and Arkla, while initially covering the Mills well, covers the entire Section 24. That JOA provides *Ricks* will become the *production operator* after the well is completed by Sanguine. The gas purchase contract, executed by Sanguine and

Arkla, requires the Seller (Sanguine) to pay all royalties and production payments. A 1982 supplement to this contract adds the Elliott well. Ricks stepped into the shoes of Sanguine, and the Elliott well was expressly added to the gas purchase contract. Further, a 1980 letter from Ricks to Arkla requests Arkla pay Ricks 100% of the proceeds from the Mills for disbursement. A 1982 letter from Ricks to another mineral owner provides Ricks is in the process of obtaining proceeds from Arkla for gas produced from the Mills and will distribute them when received. Although the Division Order Title Opinion on the Elliott shows Ricks' principals as owning the working interest in the NE/4 of Section 24, it shows Ricks as owning a 3.17460% interest in the rest of the Section. Ricks is clearly an "owner of the right to drill and produce substituted for the first purchaser" under 52 O.S.1981, § 540. There is no evidence of such an arrangement between the first purchaser and the other working interest owners against whom judgment plus 12% interest was granted.

13. Although Plaintiffs argue the tender of the royalty was "conditional" and would be used by Ricks to plead estoppel to deny the leases expired, Plaintiffs have not shown by evidence how the tender of the ⅛th royalty was conditional. Ricks has never disputed Plaintiffs' rights to the ⅛th royalty: just Plaintiffs' rights to revenue on a ⅞ths working interest.