*2008 OK CIV APP 17*

Tracy TARRANT, d/b/a Trace Oil; Paul E. Ellis; Keller J. Wiedey; Wendell J. Wiedey, Frederick E. Walta; Roberta Mae Walta; and Val Eugene Walta, Plaintiff/Appellees,

and

Alice E. Fisher, Douglas K. Fisher, Gary L. Fisher, Frankie Taylor, and Shirley Kramer, Plaintiffs,

v.

CAPSTONE OIL & GAS CO., Defendant/Appellant.

No. 102,375.

Court of Civil Appeals of Oklahoma, Division No. 1.

Oct. 5, 2007.

Rehearing Denied Nov. 30, 2007.

Certiorari Denied Feb. 19, 2008.

Allen Wayne Campbell, Matthew L. Standard, Kirk & Chaney, Oklahoma City, OK, and Robert Samuel Glass, Brian L. Mitchell, R. Charles Wilkin, Glass Wilkin, P.C., Tulsa, OK, for Plaintiff/Appellees.

Doneen Douglas Jones, Mark Stonecipher, Jay Patrick Walters, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, OK, for Defendant/Appellant.

CAROL M. HANSEN, Presiding Judge.

¶ 1 Defendant/Appellant, Capstone Oil & Gas Co. (Capstone), seeks review of the trial court's orders granting summary judgment

against Capstone on certain liability issues, and judgment based on a jury verdict against it on the remaining issues, including damages. We affirm the summary judgment to the extent the trial court granted declaratory judgment finding Plaintiff/Appellee, Tracy Tarrant d/b/a Trace Oil (Trace), succeeded Capstone as operator. We otherwise reverse the summary judgment and judgment based on the jury verdict, and remand for new trial on Trace's claims against Capstone for breach of contract and fraud.

¶ 2 Trace, the remaining Plaintiff/Appellees (Royalty Owners), and other Plaintiffs, who dismissed their actions against Capstone and are not parties to this appeal, sued Capstone for claims arising from Capstone's workover of the Alice Fisher # 1–1 Well (Well) in Kingfisher County, Oklahoma. Capstone, as operator and owner of 45.16% of the working interest in the Well, and Trace, as owner of 45.22% of the working interest, were parties to a joint operating agreement (JOA),[1] dated March 11, 1984, governing operations of the Well. In 2000, Capstone proposed a workover of the well and served an authorization for expenditure (AFE) on the other working interest owners, estimating the cost at $110,227.00.

¶ 3 The JOA allows working interest owners to choose whether to consent to the AFE and participate in the proposed operation by paying their share of the costs. A working interest owner who chooses not to consent, called "going non-consent," relinquishes that owner's interest in the well and share of production to the consenting owners until 300% of the non-consenting owner's share of the costs is paid from production to the consenting owners. Trace consented to the original AFE, committing to pay its proportionate share in the amount of $49,845.67. Upon Capstone's demand for payment, Trace paid only 35,337.02.

¶ 4 Capstone's demand to consenting owners for payment for their share of the AFE stated, "All funds will be placed in escrow and copies of all bills will be provided to you when the work is completed." Capstone's business manager admitted the funds were placed in Capstone's general account rather than in escrow, and Capstone provided copies of the bills to some but not all of the working interest owners when the work was completed. He agreed Capstone did not place its own proportionate share of the costs in an escrow account.

¶ 5 Capstone later issued a supplemental AFE for the workover in the amount of $260,456.35, which included the original $110,227.00. Trace applied for a loan from First Capital Bank (Bank), which already held a security interest in Trace's interest in the Well. Bank presented Trace with a document titled "Supplemental Agreement to Operating Agreement Covering the Alice Fisher 1–1" (Supplemental Agreement), the parties to which were Trace's principal, Tracy Tarrant, and Capstone. The agreement provided for Trace to pay the balance of its share of the costs on the original AFE and to go non-consent on the supplemental AFE. Tarrant stated Bank prepared the Supplemental Agreement in consultation with Capstone without input by Trace, while Capstone's principal stated the terms of the agreement had not been discussed with him before Bank presented it to him for his signature. Tarrant stated Capstone had already signed the agreement when it was presented to him, and Capstone's principal stated Tarrant had already signed the agreement when it was presented to him. Tarrant said Bank's representative told him the loan would not be approved unless he signed the Supplemental Agreement. He signed it, and Trace paid the balance of its share of the costs on the original AFE and went non-consent on the supplemental AFE.

¶ 6 Capstone repaired the Well using related entities. Capstone's business manager stated the charges of the related entities were usual and ordinary and were at the average commercial rates prevailing in the area of the Well for independent contractors doing work of the same or similar nature. Trace's auditor stated the charges were excessive and incurred in violation of Council of

1. The JOA was on American Association of Petroleum Landmen (AAPL) Form 610 (1977 revi- sion).

Petroleum Accountant Societies (COPAS) standards for the use of services of related entities. Trace's accountant stated Capstone still owed its related entities substantial amounts on the workover.

¶ 7 After Capstone restored the Well to production in 2001, it submitted a statement to Trace calculating Trace's 300% penalty based on total expenses for the workover of $623,069.23, while calculating the penalty of other non-consenting owners based on $260,456.35, the workover cost set forth in the supplemental AFE. Capstone's business manager stated he did so on advice of counsel. He also said Capstone filed a lien on Trace's interest in the Well.

¶ 8 Capstone admitted it did not timely pay royalties on gas production to Royalty Owners, but asserted it paid back royalties, as well as the 12% interest penalty provided by the Oklahoma Production Revenue Standards Act (PRSA), 52 O.S.2001 § 570.1 et seq., in May and June 2004, soon after the present suit was filed. The non-appealing Plaintiffs dismissed their claims, and Royalty Owners maintained their claim for damages, attorney fees, and costs arising from non-payment of royalties.

¶ 9 In 2004, 51% of the working interest owners, including Trace, voted to remove Capstone as operator, selecting Trace as successor operator. Those so voting were all non-consenting working interest owners. Trace placed locks on the well site, but Capstone cut the locks and re-entered the well site. Capstone's business manager asserted it did so on advice of counsel.

¶ 10 The trial court granted summary judgment in favor of Trace and Royalty Owners. It ruled Capstone had breached its fiduciary duty as operator, perpetrated fraud against the plaintiffs, and breached the JOA. It granted declaratory judgment finding Capstone was removed as operator of the Well and Trace was the legitimate operator. It granted Royalty Owners "partial summary judgment . . . by reason of [Capstone's] failure to implement timely royalty distribution and accounting procedures," but denied summary judgment and set for trial the claims for violation of the Production Revenue Standards Act, unjust enrichment and slander of title. It also set for trial the issues of damages, attorney fees, costs, and all other relief.

¶ 11 At trial, the trial court informed the jury it had found for Trace on Trace's claims for breach of contract, fraud, and breach of fiduciary duty, and the jury was to decide damages. It instructed the jury, "Plaintiff Royalty Owners each have one claim upon which the Court has not ruled, a claim for conversion. You will be asked to decide whether Capstone is liable for those claims." The jury rendered its verdict setting Trace's damages for breach of fiduciary duty at $1,500,000.00, for breach of contract at $569,287.65, and for fraud at $742,516.50. On Royalty Owners' claims, it awarded $16,533.38 to Paul E. Ellis, $8,268.69 to Keller J. Wiedey, $8,268.69 to Wendell J. Wiedey, $3,099.90 to Frederick E. Walta, $2,409.14 to Roberta Mae Walta, and $11,025.10 to Val Eugene Walta. It found Capstone acted with reckless disregard of the plaintiffs' rights and intentionally and with malice toward them, and awarded punitive damages to Trace of $3,000,000.00 for breach of fiduciary duty and $1,485,033.00 for fraud. It awarded punitive damages of $50,833.33 to each of the Royalty Owners. The trial court entered judgment based on the jury verdict. Capstone appeals.

■■■ ¶ 12 We will review the trial court's summary judgment under a de novo standard. Carmichael v. Beller, 1996 OK 48, 914 P.2d 1051, 1053. Summary judgment is appropriate only when there is no substantial controversy as to any material fact and one of the parties is entitled to judgment as a matter of law. 12 O.S.Supp.2002, Ch. 2, App. 1, Rule 13. The trial court may not weigh the evidence on a motion for summary judgment. Stuckey v. Young Exploration Co., 1978 OK 128, 586 P.2d 726, 730. Rather, it must view all inferences and conclusions to be drawn from the evidentiary materials in the light most favorable to the party opposing the motion. Northrip v. Montgomery Ward & Co., 1974 OK 142, 529 P.2d 489, 497. The focus in summary process is on whether the evidentiary materials as a whole show undisputed material facts that will support but a single inference in favor of the movant's quest for relief. It is a method for

identifying and isolating non-triable fact issues, not for defeating the opponent's right to trial by jury. *Gray v. Holman,* 1995 OK 118, 909 P.2d 776, 781.

## I

¶ 13 The trial court's summary judgment correctly resolved one issue that was strictly a question of law, namely, whether the election by a majority of working interest owners, who were in non-consent status, served to remove Capstone as operator and replace it with Trace. Construction of an unambiguous contract is a matter of law. *Cook v. Oklahoma Bd. of Public Affairs,* 1987 OK 22, 736 P.2d 140, 145. The JOA provides the operator may be removed for failure to carry out its duties "by the affirmative vote of two (2) or more Non-Operators owning a majority interest based on ownership as shown on Exhibit 'A'." The JOA includes an attachment, although it is not labeled "Exhibit A," listing the signatory parties who are non-operators. The JOA provides the successor operator "shall be selected from the parties owning an interest in the Contract Area at the time such Operator is selected." Capstone argues the non-consenting parties have no right to vote on the operator because they have relinquished their interests pending payment of the 300% penalty.

¶ 14 In 1985, the Texas Court of Appeals acknowledged, "There is not an abundance of authority for determining what interest non-consenting working interest holders own." *Railroad Comm'n of Texas v. Olin Corp.,* 690 S.W.2d 628, 630 (Tex.App.1985). It characterized the non-consenting owner's interest as a "Manahan-type carried interest," which was reversionary rather than possessory, but held the non-consenting owner retained a sufficient working interest to be held liable for plugging the well. *Id.* at 631. The Court revisited the issue in 1997 in specifically addressing whether the non-consenting working interest owner retained the right to vote on removal and appointment of operator under the 1982 version of the AAPL Form 610 JOA. It stated,

> Despite a non-consenting party's relinquishment of control and share in the sub-

sequent operation, the non-consenting party remains a party in the overall venture and continues to have a substantial degree of control even over the project in which it is not participating. The non-consent party retains the right of access to all portions of the contract area. Most significant to this case, the non-consent party continues to have voting rights in the removal and appointment of the operator, which provides a forum for voicing complaints on the nature of operations for any well in the contract area. Voting rights are undiluted by a non-consent position.

*Hill v. Heritage Resources, Inc. (Hill),* 964 S.W.2d 89, 111 (Tex.App.1997). Capstone cites a subsequent Texas Court of Appeals case in which the Court affirmed a ruling that certain non-consenting owners had failed to select a successor operator. *Stable Energy, L.P. v. Kachina Oil & Gas, Inc.,* 52 S.W.3d 327, 333–334 (Tex.App.2001). However, the Court based its ruling on the non-consenting owners not having acquired a majority interest at the time of the vote, and stated it did not need to address whether the non-consenting owners retained the right to vote. *Id.*

¶ 15 The relevant provisions of the AAPL Form 610–1977 in this case do not differ materially from those in the AAPL Form 610–1982 in the *Hill* case. The JOA states the voting rights are based on ownership as listed, and does not provide such rights are modified by later elections not to participate in subsequent operations. We agree with *Hill* that voting rights are undiluted by a non-consent position. The trial court properly granted declaratory judgment finding Trace had succeeded Capstone as operator.

## II

¶ 16 The trial court erred in granting summary judgment in favor of Trace for breach of fiduciary duty because Trace failed to present any evidence establishing a fiduciary relationship between it and Capstone. Trace contends Capstone had a fiduciary duty to the working interest owners and royalty owners by virtue of being operator. However, it cites no Oklahoma cases holding an operator occupies a fiduciary position by

virtue of a JOA rather than an unitization order. In *Leck v. Continental Oil Co.*, 1989 OK 173, 800 P.2d 224, 229, the Court stated, "[W]e have recognized the existence of a fiduciary duty owed by a unit to the royalty owners and lessees who are parties to the unitization agreement or subject to the order creating the unit. This is not a duty created by the lease agreement but rather by the unitization order and agreement.". There is no evidence in the record the Well is a unit well drilled pursuant to a unitization order. Breach of duties under the JOA gives rise to a breach of contract claim, not one for breach of fiduciary duty. Because we reverse the summary judgment finding liability for breach of fiduciary duty, we must also reverse the judgment for compensatory and punitive damages for breach of fiduciary duty.

### III

■ ¶ 17 Summary judgment on Trace's claims for breach of contract and fraud is precluded by the presence of disputed material facts. The trial court improperly made fact findings on controverted evidence. It found Capstone breached the JOA by using related entities without safeguards, although Capstone submitted evidence the charges were at the average prevailing rates. It found the Supplemental Agreement was "fraud-riddled" although Capstone put on evidence it did not prepare the agreement and did not see it until after Bank obtained Tarrant's signature on it. The trial court viewed other acts by Capstone as supporting a finding of fraud, drawing inferences and conclusions from the evidentiary materials in the light most favorable to Trace rather than to Capstone. Trace asserted it relied on Capstone's misrepresentations, but put on no evidence how it did so. The evidentiary materials as a whole do not show undisputed material facts supporting but a single inference in favor of Trace's quest for relief. Capstone was entitled to have its liability for breach of contract and fraud determined by a jury. Because we reverse the summary judgment finding liability for breach of contract and fraud, we must also reverse the judgment for compensatory and punitive damages related to those causes of action.

We remand for new trial as to Trace's claims against Capstone for breach of contract and fraud.

### IV

¶ 18 The trial court denied summary judgment on Royalty Owners' claim for violation of the PRSA, stating it remained for adjudication by trial. The PRSA allows for recovery of unpaid royalties with interest, damages for injury to business or property arising from the violation, litigation costs, and attorney fees. 52 O.S.2001 § 570.14(A) and (C). However, the pre-trial minute order stated the issues under the PRSA were resolved except for the attorney fees issue, which was reserved until the conclusion of the case. The parties' stipulations that were provided to the jury stated the Royalty Owners had only one claim upon which the trial court had not ruled, that being for conversion, and the jury would be asked to decide Capstone's liability for conversion.

¶ 19 Royalty Owners put on evidence Capstone placed their royalties in its operating account and used the money for its business operations without Royalty Owners' consent. Capstone did not pay the royalties to Royalty Owners until after they filed the present suit. Royalty Owners submitted into evidence Capstone's records showing the royalties due each Royalty Owner.

¶ 20 The trial court submitted the conversion claim to the jury, instructing them as follows:

> Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of inconsistent with his rights therein, or any wrongful exercise or assumption of authority personally or by procurement, over another's goods, depriving him of the possession, permanently or for an indefinite time.
>
> . . .
>
> If you find that Capstone is liable to a Royalty Owner for conversion, you must decide whether damages have been incurred by that Royalty Owner as a result of the conversion. The amount of damage should be equal to the value of the proper-

ty at the time of the conversion with interest.

When the trial court asked for any objections to the jury instruction, Capstone's attorney stated, "there is a question with regard to damages for conversion," but he had no problem "in the form" of the jury instruction. While the jury was out, Capstone moved for a directed verdict as to Royalty Owners because they had been compensated all royalties and statutory interest and there was no evidence the Royalty Owners suffered "any other damages." Capstone also moved for mistrial based on the trial court having granted summary judgment on liability to Trace instead of submitting all issues to the jury. The trial court denied a directed verdict, stating, "there was sufficient proof of conversion to take it to the jury," and denied mistrial.

¶ 21 On appeal, Capstone contends, "There was insufficient competent evidence to support the Royalty Owners' conversion claim as a matter of law." It argues only tangible personal property may be converted, citing *Welty v. Martinaire of Okla., Inc.,* 1994 OK 10, 867 P.2d 1273, 1275, and there can be no conversion if the owner consented to the property's disposal, citing *Wright v. School Dist. No. 97,* 1912 OK 786, 128 P. 241, 242. Royalty Owners respond that Capstone has preserved no error except for the propriety of the grant of summary judgment because Capstone moved for new trial without raising any other issues. Capstone moved for mistrial rather than new trial; in so doing it did not waive any allegations of error on appeal pursuant to 12 O.S.2001 § 991(b). Royalty Owners cite *Clark v. Slick Oil Co.,* 1922 OK 137, 88 Okla. 55, 211 P. 496, 502, as holding a royalty owner is entitled to damages for conversion of unpaid oil royalties. However, in that case, the royalties were paid in kind, so that failure to pay royalties deprived the royalty owner of tangible personal property.

¶ 22 The trial court erred in submitting the conversion claim to the jury. Conversion does not lie for a debt. *Welty v. Martinaire of Okla., Inc.,* 867 P.2d at 1275. The failure to pay royalties in this case created a debt; it did not result in Royalty Own-

ers being deprived of tangible personal property. Although Capstone failed to object to the jury instruction on conversion, it did object to the issue being submitted to the jury by moving for directed verdict, thereby preserving the error for appeal. The record presents no evidence supporting a conversion claim. The trial court's judgment in favor of Royalty Owners must be reversed. Because we reverse the judgment as to the claim underlying punitive damages, we must reverse the judgment for punitive damages as well.

¶ 23 For the foregoing reasons, the trial court's summary judgment is AFFIRMED to the extent it granted declaratory judgment finding Trace had succeeded Capstone as operator and is otherwise REVERSED. The trial court's judgment based on the jury verdict is REVERSED. This matter is REMANDED for new trial on Trace's claims against Capstone for breach of contract and fraud.

BUETTNER, J., concurs, and BELL, J., concurs in part and dissents in part.