2010 OK CIV APP 61

Nancy Fuller HEBBLE and Susan Fuller Maley, as Individuals; Nancy Fuller Hebble and Susan Fuller Maley, as Co–Trustees of Thomas R. Fuller Testament Trust; Wachovia Bank, N.A., as Executor of the Estate and Trust of Elizabeth Fuller Gardner Trust; and Marshall T. Steves, Trustee of the Dings Trust Agency, Plaintiff/Appellees,

v.

SHELL WESTERN E & P, INC., and Shell Oil Company, Defendant/Appellants.

No. 106,470.

Court of Civil Appeals of Oklahoma, Division No. 3.

Dec. 18, 2009.

Rehearing Denied Jan. 26, 2010.

Certiorari Denied April 12, 2010.

Randall K. Calvert, Calvert Law Firm, Oklahoma City, OK, and Clark O. Brewster, Guy A. Fortney, Brewster & De Angelis Law Firm, Tulsa, OK, for Plaintiff/Appellees.

Sharon T. Thomas, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., and R. Brad Miller, Durbin, Larimore & Bialick, Oklahoma City, OK, and Gregory A. McKenzie, Gregory A. McKenzie, P.C., Edmond, OK, for Defendant/Appellants.

John N. Hermes, Gary W. Catron, Kristin M. Simpsen, McAfee & Taft, Oklahoma City, OK, for Amicus Curiae, Oklahoma State Chamber of Commerce and Industry, Inc.

Mark D. Christiansen, Crowe & Dunlevy, Oklahoma City, OK, for Amicus Curiae, The Oklahoma Independent Petroleum Association.

Brian R. Matula, Oklahoma City, OK, for Amicus Curiae, Chesapeake Energy Corp.

Dennis C. Cameron, Bradley W. Welsh, Gable & Gotwals, Tulsa, OK, for Amicus Curiae, ConocoPhillips Company.

CAROL M. HANSEN, Presiding Judge.

¶ 1 Defendant/Appellants, Shell Western E & P, Inc. and Shell Oil Company (collectively Shell), seek review of the trial court's judgment based on a jury verdict in favor of Plaintiff/Appellees (Owners) for $13,205,916.00 in actual damages and $53,625,000.00 in punitive damages in Owners' action for underpayment of oil and gas proceeds. At issue is whether Owners's claims sounded in tort such that the statute of limitations was tolled until Owners learned of their loss. We hold Shell owed a fiduciary duty to Owners arising from its resort to the police powers of the state in unitizing oil and gas interests, and therefore, Owners timely brought a tort claim. We find no error of law in the conduct of trial and affirm.

¶ 2 Owners are the successors to a net profits interest reserved in a 1927 assignment of an oil and gas lease (Crews Lease) in Stephens and Carter Counties, Oklahoma.[1] Shell acquired the Crews Lease in 1948 and drilled wells on the lease through the 1950s, paying a share of the net profits to Owners or their predecessors. In 1964, the Oklahoma Corporation Commission (Commission) granted Shell's application to create a waterflood unit for secondary recovery in the Sims

---

1. The assignment provided in part,
   If said well produces oil or gas in paying quantities, then in that event the party of the second part, as an additional consideration for the assignment, agrees to carry the party of the first part for an undivided one-fourth (1/4) of the seven-eighths (7/8) working interest in said above described oil and gas mining lease; that is to say, the party of the second part shall advance all of the cost of drilling, development and operation necessary or convenient, and shall receive all of the oil and gas produced therefrom until the sales of oil and gas produced from said property shall have reimbursed the party of the second part for all monies so expended in the drilling, development and operation of said lease, including all cost of investment and expense necessary or incident to the proper development and operation of said property, and after the second party has been so reimbursed, then the party of the first part is to receive one-fourth (1/4) of the net profits derived by the party of the second part from said premises.

Sand, called the Brittain Sims Unit. The Commission's order adopted a unitization plan which designated Shell as the unit operator. The plan expressly addressed net profits interests:

Any net profits, net proceeds, or other interest of a similar nature, which is payable out of profits resulting from operations under the instrument creating such interest, shall be payable as provided in such instrument, except that as to the Unitized Formation underlying the lands covered thereby included in the Unit Area, such computations shall be based not upon actual production from and costs incurred in operations on such land, but instead upon that portion of the unit production and unit expense which is allocated to such lands under the terms hereof.

In 1970, the Commission created the Brittain Deese Unit for secondary recovery by waterflood in the Deese Sands. It again adopted a unitization plan designating Shell as operator and providing the same language quoted above regarding net profits interests.

¶3 In 1972, the Commission adopted an order establishing 80–acre drilling and spacing units for the development of oil from the Sycamore formation. The order provided in part:

4. That all royalty interests within any spacing unit shall be communitized and each royalty owner within any unit shall participate in the royalty from the well drilled thereon in the relation that the acreage owned by him bears to the total acreage in the unit.

5. That in the event there are divided or undivided interests within any unit and the parties are unable to agree on a plan for the development of the unit, then their rights and equities shall be adjudicated by the Commission as provided for by subsection d, Section 87.1; Title 52, OSA.

Shell was the operator of the Brittain Deep No. 2, a unit well in the Sycamore. According to Shell, the Brittain Deep No. 2 was not located on the Crews Lease but was in the same 80–acre drilling and spacing unit for the Sycamore, and therefore revenue and expenses from that well should have been included in the net profits calculations for the Crews Lease.

¶4 In 1985, Shell sold its interest in the Crews Lease to Maynard Oil Company (Maynard). Shell admits it failed to pay Owners $750,708.00 in net profits from 1973 through 1985. Over $715,000.00 from the Brittain Deep No. 2 Well and the rest was from the Brittain Deese Waterflood Unit. Shell paid the net profits due from the Brittain Sims unit.

¶5 In 1995, Owners filed the suit below against Shell and Maynard, seeking actual and punitive damages under theories of fraud and breach of statutory and quasi-fiduciary duties. Maynard settled with Owners and was dismissed. Shell filed multiple motions for summary judgment on statute of limitations grounds, among others. The trial court denied summary judgment, ruling Shell as operator had a fiduciary or quasi-fiduciary duty to non-operators whose interests were unitized by Commission order. It ruled Shell's duties continued until repudiation by Shell and communication of the repudiation to Owners. It found there were issues of material fact preventing summary judgment on the statute of limitations defense to the breach of fiduciary claim. It also found there was an issue of material fact as to when Owners knew or should have known of Shell's alleged fraud, preventing summary judgment on the statute of limitations defense to Owners' fraud claim.

¶6 The parties tried the matter to a jury in May 2008. The trial court bifurcated the issues of liability and actual damages from the issue of punitive damages. The jury found for Owners on their claims for (1) false representation, nondisclosure or concealment, deceit, or constructive fraud, and (2) breach of fiduciary duty. It awarded actual damages in the amount of $13,205,916.00. Prior to submitting the case to the jury at the second stage of trial, the trial court lifted the cap on punitive damages pursuant to the statute in effect at the time the case was filed, 23 O.S.1991 § 9(A). The jury then awarded $53,625,000.00 in punitive damages. The trial court entered judgment for Owners in the amount of $66,830,916.00. It denied Shell's motions for judgment notwithstanding

the verdict and for remittitur or new trial. Shell appeals from these orders.

## I

¶ 7 As a threshold matter, we must address Shell's contention the trial court erred in ruling Shell had a fiduciary duty to Owners and the statute of limitations did not begin to run on Owners' claim for breach of the fiduciary duty until Shell repudiated its fiduciary duty and communicated that repudiation to Owners. Shell asserts Owners' claims are contract-based and subject to the five-year limitations period of 12 O.S.Supp. 2008 § 95(A)(1).

¶ 8 In Oklahoma, oil and gas operators have no fiduciary duty to non-operators arising solely from contracts such as leases, communitization agreements, or joint operating agreements. *Howell v. Texaco Inc. (Howell)*, 2004 OK 92, 112 P.3d 1154, 1160–1161, and *Tarrant v. Capstone Oil and Gas Co. (Tarrant)*, 2008 OK CIV APP 17, 178 P.3d 866, 870–871. An operator's breach of duties under such agreements gives rise to a breach of contract claim, not a breach of fiduciary duty claim. *Tarrant*, 178 P.3d at 871.

¶ 9 However, the Oklahoma Supreme Court has "recognized the existence of a fiduciary duty owed by a unit to the royalty owners and lessees who are parties to the unitization agreement or subject to the order creating the unit. This is not a duty created by the lease agreement but rather by the unitization order and agreement." *Leck v. Continental Oil Co. (Leck)*, 1989 OK 173, 800 P.2d 224, 229. After unitization, the leases no longer control. *Howell*, 112 P.3d at 1161. Instead, the parties' relationships are defined by statute and by Commission order. "The unit organization with its operator stands in a position similar to that of a trustee for all who are interested in the oil production either as lessees or royalty owners." *Young v. West Edmond Hunton Lime Unit*, 1954 OK

195, 275 P.2d 304, 309. The fiduciary duty of the unit operator arises not only from the creation of field-wide units for secondary recovery under 52 O.S.2001 §§ 287.1–287.15, but also from the creation of drilling and spacing units under 52 O.S.Supp.2007 § 87.1. *E.g., Leck*, 800 P.2d at 229. The critical factor is the resort to the police powers of the state on the part of a lessee in unitization proceedings which modify and amend existing legal rights. *Olansen v. Texaco Inc.*, 1978 OK 139, 587 P.2d 976, 985.

¶ 10 In the present case, Shell as the unit operator owed a fiduciary duty to Owners to properly account for and distribute oil and gas proceeds from the units. As to the Brittain Deese unit, this duty clearly arose from the Commission order creating the unit and appointing Shell as unit operator. The situation as to the Brittain Deep No. 2 unit is less clear-cut. The Commission created the unit and ordered the royalty interests communitized, but it did not pool the working interests and appoint an operator. Shell became the operator pursuant to a joint operating agreement (JOA) between the working interest owners. Had Owners been parties to the JOA, we would not find a fiduciary duty. Owners were not parties to the JOA because the net profits interest, although carved out of the working interest, did not include the right to drill. The Brittain Deep No. 2 was not drilled on the Crews Lease; therefore Shell's duty to Owners arose from the Commission's exercise of its police power on the lessees' behalf. Owners' right to payment from the oil proceeds in the unit was communitized as royalty within the meaning of the term as used in § 87.1 and the Commission's order.[2] Accordingly, Shell as the unit operator owed a fiduciary duty to Owners.

¶ 11 The trial court instructed the jury an action for breach of fiduciary duty must be brought within two years of the date Owners knew or should have been aware Shell repu-

---

2. The treatment of a net profits interest as a royalty interest is consistent with the definition of royalty interest in the Production Revenue Standards Act, 52 O.S.2001 § 570.2(6), as a "percentage interest in production or proceeds ... reserved or granted by a mineral interest owner exclusive of any interest defined as a working interest or subsequently created interest." It is not a "subsequently created interest" under § 570.2(10) because the assignment reserving the interest did not specify the interest would not be communitized.

diated its fiduciary duties to Owners. It defined repudiation as "a clear, express communication of rejection of the fiduciary duty." The instruction is correct but incomplete. The trial court based the instruction on the rationale of Justice Summers' opinion, concurring in result, in *Goodall v. Trigg Drilling Co., Inc. (Trigg)*, 1997 OK 74, 944 P.2d 292, 297, in which he characterized the relationship between operator and royalty interest owner as quasi-fiduciary and cited *Becker v. State ex rel Dept. of Public Welfare*, 1957 OK 102, 312 P.2d 935, 942 for the proposition "the statute of limitations begins to run when a trustee repudiates the trust and such fact is brought to the knowledge of the beneficiary." However, both Summers and the majority recognized the running of the limitations period would be triggered by the interest owner's knowledge the operator owed the interest owner money. *Trigg*, 944 P.2d at 295 and 297.

¶ 12 In other words, the discovery rule applicable in tort cases applies to breach of fiduciary duty. The statute of limitations on Owners' claims for breach of fiduciary duty began to run when they knew or, in the exercise of reasonable diligence, should have known of their injury. *Szczepka v. Weaver*, 1997 OK CIV APP 35, 942 P.2d 247, 249. Merely showing Owners knew the well was producing would not be sufficient to show they knew or should have known of their injury. Owners were not due payment until sales of oil and gas produced from the property had reimbursed the operator for the expenses of drilling, development and operation of the lease. This information was available only from Shell. Owners would not know Shell held proceeds belonging to them, and whether they were due payment, until they knew the amount of sales and expenses for the units.

¶ 13 Although the trial court did not instruct the jury on the discovery rule with regard to the breach of fiduciary duty claim, it did instruct on the discovery rule as to the statute of limitations on Owners' claim for false representation. The trial court presented the two claims to the jury as alternative theories of recovery for the same injury, and the jury found for Owners on both

claims. In order to find for Owners on the false representation claim, the jury had to find Owners did not know Shell was not paying them their share of the net profits prior to a date two years before they filed their petition. Therefore, we are unable to find the jurors were misled and reached a different conclusion than they would have reached but for the incomplete instruction on the running of the limitation period for breach of fiduciary duty. *Cimarron Feeders, Inc. v. Tri–County Elec. Coop., Inc.*, 1991 OK 104, 818 P.2d 901, 902.

## II

¶ 14 Shell's next contention is the trial court erred in failing to instruct the jury on the proper burden of proof for fraud. Owners assert Shell failed to preserve any error from the refusal to give Shell's requested instructions Nos. 36 and 38. We agree. The manner for objecting to jury instructions is set forth in 12 O.S.2001 § 578:

> A party excepting to the giving of instructions, or the refusal thereof, shall not be required to file a formal bill of exceptions; but it shall be sufficient to make objection thereto by dictating into the record in open court, out of the hearing of the jury, after the reading of all instructions, the number of the particular instruction that was requested, refused and is excepted to, or the number of the particular instruction given by the court that is excepted to. Provided, further, that the court shall furnish copies of the instructions to the plaintiff and defendant prior to the time said instructions are given by the court.

At the jury instruction conference during the trial below, Shell's attorney dictated into the record the numbers of the jury instructions Shell requested, the trial court refused, and Shell excepted to. Shell did not include requested instructions Nos. 36 and 38 in its listing. After stating Shell's objections to the refused instructions, its attorney made a blanket exception to all of the instructions that were given. He did not make a blanket exception to the refused instructions. Based on this record, we do not find Shell made known to the trial court its objection to the

refusal to give Shell's requested instructions 36 and 38. The burden of proof instruction the trial court gave was Oklahoma Uniform Jury Instruction—Civil No. 3.1, which was Shell's requested instruction No. 8. We find no fundamental error.

¶ 15 Shell also argues the jury's verdict is unsupported by any evidence each Owner relied on Shell's misrepresentation. In order to preserve a challenge to the sufficiency of the evidence, a party must move for directed verdict at the close of all the evidence and before the issues are submitted to the jury. *Drouillard v. Jensen Const. Co. of Oklahoma, Inc.*, 1979 OK 126, 601 P.2d 92, 94. Shell waived any challenge to the sufficiency of the evidence by failing to do so.

¶ 16 Shell also challenges the use of a general verdict form. We find no abuse of discretion in the trial court's refusal to direct special findings. OKLA. CONST. Art. 7, § 15.

### III

¶ 17 Shell's next contention is the trial court erred in awarding prejudgment interest under the Production Revenue Standards Act (PRSA), 52 O.S.2001 § 570.10 (§ 540 prior to renumbering by Laws 1992, c. 190, § 28). Shell argues (1) prejudgment interest may not be awarded because Owners waived their statutory claim by not submitting it to the jury, (2) a claim for interest under § 570.10 is barred by the statute of limitations and the jury should have been instructed on that defense, and (3) the trial court improperly applied the statute retroactively.

¶ 18 The PRSA does not create a statutory claim. *Purcell v. Santa Fe Minerals, Inc.*, 1998 OK 45, 961 P.2d 188, 191–194. Rather, it imposes standards for the treatment of proceeds from the sale of oil and gas production. e.g., §§ 570.4, 570.6, and 570.10. The Legislature expressly stated its intent the PRSA applies "to all producing wells, regardless of the date pooled, drilled or of the date of the underlying leases." § 570.3. Section 570.14 sets forth a five-year statute of limitations on actions brought pursuant to its provisions, but provides in subsection (D), "nothing shall create, limit or expand any statute

of limitations applicable to production occurring prior to September 1, 1992."

¶ 19 Section 570.10 provides in part,

A. All proceeds from the sale of production shall be regarded as separate and distinct from all other funds of any person receiving or holding the same until such time as such proceeds are paid to the owners legally entitled thereto. Any person holding revenue or proceeds from the sale of production shall hold such revenue or proceeds for the benefit of the owners legally entitled thereto. Nothing in this subsection shall create an express trust.

B. Except as otherwise provided in this section:

1. Proceeds from the sale of oil or gas production from an oil or gas well shall be paid to persons legally entitled thereto:

a. commencing not later than six (6) months after the date of first sale, and

b. thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold.

. . .

D.1. Except as otherwise provided in paragraph 2 of this subsection, where proceeds from the sale of oil or gas production or some portion of such proceeds are not paid prior to the end of the applicable time periods provided in this section, that portion not timely paid shall earn interest at the rate of twelve percent (12%) per annum to be compounded annually, calculated from the end of the month in which such production is sold until the day paid.

From 1980 to 1989, the statute provided for interest of twelve percent per annum, without compounding. Laws 1980, c. 205, § 1, and Laws 1989, c. 241, § 1. Although the statute applies to all producing wells, it only alters rights and duties prospectively. *Teel v. Public Service Co. of Oklahoma*, 1985 OK 112, 767 P.2d 391, 399 (superseded by statute on other grounds). The prejudgment interest authorized by § 570.10 constitutes a part of the judgment and is considered a part of the total liability recovered. *Fleet v. Sanguine, Ltd.*, 1993 OK 76, 854 P.2d 892, 899. Prior to the statute's enactment, the general

prejudgment interest statute applied, allowing six percent interest when damages were certain or capable of being made certain by calculation. 23 O.S.2001 § 6 and 15 O.S.2001 § 266.

¶ 20 Shell held production proceeds belonging to Owners. During the time it held those proceeds, the proceeds were regarded as separate and distinct from all other funds of Shell. The proceeds Shell held prior to 1980 were subject to prejudgment interest pursuant to 23 O.S.2001 § 6. From 1980 to 1989 the proceeds were subject to interest provided by the version of § 540 (§ 570.10) in effect at the time. When Shell continued to hold the proceeds after the effective date of the 1989 amendment, the proceeds were subject to the compounded interest rate of twelve percent in effect thereafter. The trial court's instruction to the jury properly incorporated the applicable law on the awarding of prejudgment interest for each time period.

## IV

¶ 21 Lastly, Shell contends the improper punitive damages award requires new trial or remittitur. It argues (1) punitive damages are not allowed for breach of contract, (2) punitive damages should have been capped because there was no evidence of evil intent, (3) punitive damages duplicated the penalty of prejudgment interest under § 540 (§ 570.10), (4) prejudgment interest was not part of compensatory damages and should not have been considered in determining the amount of punitive damages, and (5) the punitive damages award was excessive and in violation of the U.S. Constitution.

¶ 22 As discussed in Part I above, Owners properly brought this action in tort and not in contract. As discussed in Part III above, prejudgment interest under the PRSA is part of compensatory damages. Although prejudgment interest under § 540 (§ 570.10) was characterized as penal in *Fleet v. Sanguine, Ltd.,* 1993 OK 76, ¶ 11, 854 P.2d 892, 899–900, and *McClain v. Ricks Exploration Co.,* 1994 OK CIV APP 76, ¶ 18, 894 P.2d 422, the Court in *Purcell v. Santa Fe Minerals, Inc.,* 1998 OK 45, ¶ 17, 961 P.2d 188, recognized the Legislature abrogated that characterization by deleting the phrase "as a penal-

ty" from the statute in 1985. Therefore, the imposition of prejudgment interest does not preclude a punitive damages award.

¶ 23 The trial court applied the punitive damage statute in effect at the time this case was filed, 23 O.S.1991 § 9, which provided in part,

> In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant, in an amount not exceeding the amount of actual damages awarded. Provided, however, if at the conclusion of the evidence and prior to the submission of the case to the jury, the court shall find, on the record and out of the presence of the jury, that there is clear and convincing evidence that the defendant is guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed, then the jury may give damages for the sake of example, and by way of punishing the defendant, and the percentage limitation on such damages set forth in this section shall not apply.

The trial court made the requisite finding on the record and out of the presence of the jury there was "clear and convincing evidence of fraud, non-disclosure, concealment, deceit," and lifted the cap on punitive damages. It then submitted the question of punitive damages to the jury.

¶ 24 We review the trial court's initial determination of the presence of clear and convincing evidence of fraud for error of law. *Rodebush By and Through Rodebush v. Oklahoma Nursing Homes, Ltd.,* 1993 OK 160, 867 P.2d 1241, 1247. The testimony of Shell's division order analyst provided clear and convincing evidence Shell knew in 1988 it held oil proceeds belonging to Owners. The testimony of Shell's designated corporate representative is clear and convincing evidence (1) Shell knew Owners did not know about the proceeds, (2) Shell did not tell

Owners about the proceeds, (3) Shell knew Owners relied on Shell's operating statements, and (4) Shell intended to keep Owners' proceeds based on its position the statute of limitations had run in 1987, two years after it sold the Crews Lease to Maynard. Based on this record, we hold the trial court did not err as a matter of law in its initial determination of the presence of clear and convincing evidence of fraud.

¶ 25 A grossly excessive punitive damage award violates the Fourteenth Amendment right to due process. *BMW of North America, Inc. v. Gore (Gore),* 517 U.S. 559, 569, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996). In reviewing punitive damages for constitutionality, we must "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418, 123 S.Ct. 1513, 1520, 155 L.Ed.2d 585.

¶ 26 In the present case, the reprehensibility of Shell's conduct is heightened by its intentional deceit of the interest owners whose oil proceeds it held for their benefit while it owed a fiduciary duty to those owners arising from its resort to the police powers of the state in unitizing oil and gas interests. The amount of the punitive damage award was slightly more than four times the amount of the actual damages awarded. We do not find this disparity unreasonable. The punitive damage award in this case compares favorably with that in *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), where the jury awarded $19,000.00 in actual damages arising from the defendant's baseless claim on plaintiff's oil and gas interests and $10,000,000.00 in punitive damages. Proportionately, Shell has received a much lighter sanction.

¶ 27 For the foregoing reasons, the trial court's judgment is AFFIRMED.

MITCHELL, C.J., and HETHERINGTON, J. (sitting by designation), concur.