Question Submitted by: The Honorable Mike Sanders, State Representative, District 59
2015 OK AG 6
Decided: 09/01/2015
Oklahoma Attorney General Opinions

Cite as: 2015 OK AG 6, __ __

 

¶0 This office has received your request for an Attorney General Opinion in 
which you ask, in effect, the following question: Title 
52 O.S.2011, § 570.10(D) specifies 
an interest rate of 12 percent owed to non-operating owners of interest in an 
oil and gas well's production when the holders of the proceeds from the first 
sale of oil or gas fail to distribute the proceeds within the time periods 
required by statute, unless the interest owner's title is unmarketable, in which 
case the applicable interest rate is 6 percent. Does this statute violate the 
special laws prohibition in Article V, Section 46 of the Oklahoma Constitution? 

I. 
Background
¶1 In most cases, the proceeds from an oil or gas 
well are divided between the operator of the well, which typically leases the 
mineral rights, and non-operating owners of interest in the well's production, 
including royalty interest owners and investors. See In re SemCrude, 
L.P., 407 B.R. 140, 145-47 (Bankr. D. Del. 2009) (recounting the history of 
oil and gas production, and regulation thereof, in Oklahoma). When the petroleum 
production is first sold, either the lessee operator or the first purchaser 
generally has the responsibility to distribute the proceeds of that sale to the 
various interest owners. See Si M. Bondurant, To Have and to Hold: The 
Use and Abuse of Oil and Gas Suspense Accounts, 31 Okla. City U. L. Rev. 1, 
4 (2006) [hereinafter Bondurant].
¶2 For decades, oil and gas producers or first 
purchasers would for various reasons delay or decline to distribute the proceeds 
from the first sale to interest owners and use those funds for their own 
purposes until they were ultimately distributed, if at all. Id. at 1. 
Defects in the interest owner's title, liens against the title, failure to 
execute a division order, or inability to locate the owner sometimes caused the 
holder of the proceeds to suspend payments. Id. at 6. Often, however, 
holders of the production proceeds would fail to make any reasonable efforts to 
locate the interest owners or notify them of their interest, suspending payments 
until they were demanded and, in the meanwhile, gaining the benefit of the 
possession of those funds. Id. When payment was finally made, the holders 
often refused to make interest payments on the funds withheld. Id. at 
17-18. "In the inflationary times of the late 1970s and early 1980s when the 
prime interest rate soared to 21.5%, there was a great incentive to delay 
royalty payments" and "many producers routinely suspended royalties and delayed 
payment for many months and even years to take advantage of the interest earned 
during the float between the receipt of sales proceeds and disbursement of 
royalties." Id. at 18. This not only deprived interest owners of the 
time-value of the money owed to them, it also gave rise to "an ever increasing 
case load of litigation between royalty owners and purchasers . . . precipitated 
by the use of suspense accounts." Hull v. Sun Refining & Mktg. Co., 
1989 OK 168, ¶ 9, 789 P.2d 1272, 1277.
¶3 These practices led many states to enact statutes specifying payment 
timing after the first sale of oil or gas production and, in the event of 
untimely payment, the applicable rate of interest. Bondurant, at 18. Oklahoma 
passed such a statute in 1980, which is now codified at 52 O.S.2011, § 570.10 and was enacted "to 
ensure that those entitled to royalty payments would receive proceeds in a 
timely fashion," evincing legislative "intent that it shall be the public policy 
in Oklahoma for royalty owners to receive prompt payment from the sale of oil 
and gas products." Hull, 1989 OK ¶ 14, 789 P.2d at 1279.
¶4 As currently written,[1] Section 570.10 requires that:

Proceeds from the sale of oil or gas production from an oil or gas well shall 
be paid to persons legally entitled thereto: 
a. commencing not later than six (6) months after the date of first sale, and 

b. thereafter not later than the last day of the second succeeding month 
after the end of the month within which such production is sold. 

52 O.S.2011, § 
570.10(B)(1).[2] The statute also specifies the timing of payments when 
the amounts owed are small. For example, accumulated unpaid amounts less than 
ten dollars may be held until production ceases, while amounts between ten and 
one hundred dollars must be remitted at least annually. Id. § 
570.10(B)(3). When proceeds are not "paid prior to the end of the applicable 
time periods provided in [the] section, that portion not timely paid shall earn 
interest at the rate of twelve percent (12%) per annum to be compounded 
annually, calculated from the end of the month in which such production is sold 
until the day paid," unless the reason for nonpayment is because the title to 
the mineral interest is unmarketable, in which case the statutory interest rate 
is 6 percent compounded annually. Id. § 570.10(D).[3] A "first purchaser or 
holder of proceeds who fails to remit proceeds from the sale of oil or gas 
production to owners legally entitled thereto within the time limitations set 
forth" in the statute "shall be liable to such owners for interest" as specified 
by the statute. Id. § 570.10(E)(1).

II. 
Legal Principles
¶5 Article V, Section 46 of the Oklahoma Constitution prohibits the 
Legislature from passing "any local or special law . . . . Fixing the rate of 
interest[.]" A law is a "special law" if it "single[s] out less than an entire 
class of similarly affected persons or things for different treatment." 
Reynolds v. Porter, 1988 OK 88, ¶ 14, 760 P.2d 816, 822. Article V does not prohibit all 
legislative classifications; a law that creates "a proper and legitimate 
classification" is not special. City of Enid v. Pub. Emps. Relations Bd., 
2006 OK 16, ¶ 13, 133 P.3d 281, 287. If there is "some distinctive 
characteristic upon which a different treatment may be reasonably founded, and 
that furnishes a practical and real basis for discrimination," the statute is 
not a special law. Burks v. Walker, 1909 OK 317, ¶ 23, 109 P. 544, 549; see also EOG Res. Mktg., 
Inc. v. Okla. State Bd. of Equalization, 2008 OK 95, ¶ 20, 196 P.3d 511, 520-21. Rather, a statute is a 
special law if the classification it creates "is arbitrary or capricious" or 
fails to "bear[] a reasonable relationship to the object to be accomplished" and 
thus is "wholly unrelated to the object of the Act." City of Enid, 
2006 OK 16, ¶¶ 13, 16, 133 P.3d 
at 287-88.
¶6 Under these standards, a statute that is a special law legislating one of 
the subjects listed in Article V, Section 46 is "absolutely and unequivocally 
prohibit[ed]." Reynolds, 1988 OK 88 ¶ 17, 760 P.2d at 822-23. In other words, 
in a Section 46 analysis, "the only issue to be resolved is whether a statute 
upon a subject enumerated in that section targets for different treatment less 
than an entire class of similarly situated persons or things." Id.; 
see also Lafalier v. Lead-Impacted Cmtys. Relocation Assistance Trust, 
2010 OK 48, ¶ 26, 237 P.3d 181, 192.

III. 
Analysis
¶7 Any constitutional analysis proceeds "with great caution" and starts with 
"a presumption that every statute is constitutional." Lafalier, 
2010 OK 48, ¶ 15, 237 P.3d at 
188-89. Thus, courts "indulge every possible presumption that an act of the 
Legislature was constitutional." Adwon v. Okla. Retail Grocers Ass'n, 
1951 OK 43, ¶ 11, 228 P.2d 376, 379. "If there is any doubt as to the 
Legislature's power to act in any given situation, the doubt should be resolved 
in favor of the validity of the action taken by the Legislature." Draper v. 
State, 1980 OK 
117, ¶ 10, 621 P.2d 
1142, 1146. As a corollary, "[r]estrictions and limitations upon legislative 
power are to be construed strictly." Id. A law will be deemed 
unconstitutional only if it "is clearly, palpably, and plainly inconsistent with 
the Constitution." Lafalier, 2010 OK 48, ¶ 15, 237 P.3d at 188; see also Zeier 
v. Zimmer, Inc., 2006 OK 98, ¶ 12, 152 P.3d 861, 866.
¶8 Section 570.10 specifies the time frames in which the holders of the 
proceeds from the first sale of oil and gas must pay the rightful interest 
owners. To encourage compliance with this statutory duty of prompt payment, 
Section 570.10(D) provides a 12 percent rate of interest compounded annually for 
nonpayment, unless the reason for nonpayment is because the title is 
unmarketable. The statute thus sets forth a higher rate of interest for a class 
of individuals--petroleum producers or first purchasers owing sums to royalty or 
other interest owners with marketable title--as distinct from others failing to 
make timely payment under contract. For all other contractual debts, "[t]he 
legal rate of interest shall be six percent (6%) in the absence of any contract 
as to the rate of interest," unless otherwise provided for by valid law. 
15 O.S.2011, § 266. The question of whether 
Section 570.10 violates Article V, Section 46 turns on whether the statute 
"embrace[s] all of the class that should naturally be embraced" or whether, 
instead, it "rest[s] on a false or deficient classification." City of 
Enid, 2006 OK 
16, ¶ 20, 133 P.3d at 310 (Opala, J., dissenting) (citation omitted). 
¶9 Given the immense importance of the industry and the unique legal 
relationships involved, "[t]he State of Oklahoma . . . has extensively and 
continuously regulated" the oil and gas industry. Seal v. Corp. Comm'n, 
1986 OK 34, ¶ 45, 725 P.2d 278, 292; see also Oryx Energy Co. v. 
Plains Res., Inc., 1994 OK CIV APP 185, ¶ 3, 918 P.2d 397, 399. The relationships and property 
interests involved in oil and gas leases are extraordinarily complex, involving 
numerous parties over long periods of time, and the disparities in economic 
power between oil producers or first purchasers and royalty or mineral interest 
owners is often very wide. Consequently, it is reasonable that the Legislature 
sought to "provide[] a comprehensive regulatory structure governing how interest 
owners and operators work together at the wellhead, and . . . to hold operators 
accountable to their interest owners." In re SemCrude, 407 B.R. at 154. 

¶10 As recounted above, the long history of petroleum producers or first 
purchasers wrongfully withholding production proceeds for their own profit led 
the Legislature to impose statutory timeframes within which payment must be made 
and a 12 percent rate to incentivize compliance with the statute. The holder of 
these proceeds thus possesses a "distinctive characteristic upon which a 
different treatment may be reasonably founded, and that furnishes a practical 
and real basis for discrimination." Burks, 1909 OK 317, ¶ 23, 109 P. at 549. This classification 
applies to all those similarly situated--those responsible for the distribution 
of petroleum production proceeds from the first sale--including both producers 
and first purchasers. Having created a right to prompt payment to combat the 
pervasive refusal to make contract payments to interest owners that was peculiar 
to first sales in the petroleum industry, the Legislature was free to impose a 
higher rate of interest to incentivize respect for that unique substantive 
right. See State ex rel. Macy v. Bd. of Cnty. Comm'rs, 1999 OK 53, ¶ 9, 986 P.2d 1130, 1143 ("[D]ifferent remedies may be based 
upon legislatively drawn criteria that distinguish different causes of action . 
. . based upon the nature of the substantive rights at issue."). Thus, 
the class subject to the higher interest rate is not "false" or "deficient," but 
rather embraces a natural and rational class of similarly situated persons. 
City of Enid, 2006 OK 16, ¶ 20, 133 P.3d at 297-98 (Watt, 
C.J., Opala, Taylor, Colbert JJ., dissenting) (citation omitted). For the same 
reasons, Section 570.10(D)'s rate of interest is not "arbitrary or capricious" 
and bears "a reasonable relationship to the object" of the statute. Id. 
(citation omitted). Accordingly, Section 570.10(D) is not a "special law" and, 
therefore, cannot be in violation of Article V, Section 46.[4]

¶11 Similarly, courts have upheld analogous laws setting a higher rate of 
interest in the face of special law challenges when those laws were justified by 
a rational and legitimate public policy. For example, a law allowing for a 
higher rate of interest for judgments in workers' compensation suits is not an 
unconstitutional special law because the Legislature reasonably imposed that 
elevated rate to combat "frivolous appeals which . . . have often been 
prosecuted by less conscientious employers and insurance companies to 'starve' 
helpless victims of industrial injuries into early and cheap settlements." 
Cyrus v. Vierson & Cochran, Inc., 1981 OK CIV APP 40, ¶ 15, 631 P.2d 1349, 1354. In the case of Section 570.10, a 
similar history of abuse of modest interest owners by the holders of petroleum 
proceeds justifies the 12 percent interest rate. As another example, courts in 
other states with similar constitutional provisions have upheld elevated 
interest rate laws when rationally justified, permitting, for example, elevated 
interest rates on retail installment contracts because the costs of consumer 
lending (including increased risk of default, volume, and servicing costs) are 
higher than those for commercial loans to established businesses. See Cesary 
v. Second Nat'l Bank of N. Miami, 369 So.2d 917, 920-21 (Fla. 1979); 
Cecil v. Allied Stores Corp., 513 P.2d 704, 710 (Mont. 1973); but see 
Stanton v. Mattson, 123 N.W.2d 844, 846-48 (Neb. 1963). Similarly, the 
common practice of unjustified impounding of proceeds in suspense accounts, 
often requiring interest owners to institute costly litigation, creates a 
greater risk of nonpayment that may justify a higher interest rate owed by oil 
and gas producers and first purchasers.[5]
¶12 For similar reasons, the disparate interest rates owed to those with and 
without marketable title does not create a special law in violation of Article 
V, Section 46, because the two groups are not similarly situated and the 
Legislature has rationally decided that liability for nonpayment of proceeds 
should be lower when the reason for nonpayment is legitimate questions 
concerning title. See Tulsa Energy, Inc. v. KPL Prod. Co. (In re Tulsa 
Energy), 111 F.3d 88, 90 (when title is unmarketable, "[p]ublic policy 
requiring prompt payment of proceeds cannot spur on the party responsible for 
payment, because he cannot be, and is not, required to pay until the other party 
has cleared up his title"). Nor can it be said that those in the oil and 
gas industry are subject to a special law on interest rates as compared to other 
industries because other industries are not characterized by the same potential, 
incentives, and history of refusal to timely pay sums due and the frequent 
litigation that ensued. Even within the oil and gas industry, the special 
relationships and problems of distribution of proceeds at the wellhead pursuant 
to mineral leases sets these relationships in a different class than other 
contracts for petroleum products. Finally, that Section 570.10 specifies 
different time periods during which proceeds must be paid to interest owners 
does not create a special law fixing a rate of interest because, though the 
amount of interest due under the statute may vary depending on 
when various dollar thresholds are met (e.g., $10, $25, or $100), 
when interest does begin to accumulate, it does so at the same 
rate across classes. 
¶13 Even if there were doubt about the purposes of the statute, the effect of 
its revisions, or the unique situation of the oil and gas industry that by 
nature justifies its regulation as a class, those doubts must "be resolved in 
favor of the validity of the action taken by the Legislature." Draper, 
1980 OK 117, ¶ 10, 621 P.2d at 1146. 
Indulging "every possible presumption that [this] act of the Legislature was 
constitutional," Adwon, 1951 OK 43, ¶ 11, 228 P.2d at 379, it cannot be said 
that Section 570.10(D) is "clearly, palpably, and plainly inconsistent with the 
Constitution," Lafalier, 2010 OK 48, ¶ 15, 237 P.3d at 188. Section 570.10(D) 
does not "single out less than an entire class of similarly affected persons or 
things for different treatment." Reynolds, 1988 OK 88, ¶ 14, 760 P.2d at 822. Rather, in light 
of the unique history, relationships, and importance of the use of suspense 
accounts by oil and gas producers and first purchasers to unjustifiably delay 
payment to interest owners, the Legislature has recognized "a proper and 
legitimate classification" by providing for a higher rate of interest when the 
holder of proceeds delays distribution of sums to the rightful owner in 
violation of the statute. City of Enid, 2006 OK 16, ¶ 13, 133 P.3d at 287. The 
elevated rate of interest is not "arbitrary or capricious," but rather 
facilitates compliance with the prompt payment requirements of the statute, 
"bear[ing] a reasonable relationship to the object to be accomplished." 
Id. ¶¶ 13-16, 133 P.3d at 287-88 (citation omitted).
¶14 It is, therefore, the official Opinion of the Attorney General that:
Title 52 O.S.2011, § 
570.10(D) is not a special law fixing the rate of interest in violation of 
Article V, Section 46 of the Oklahoma Constitution because it does not single 
out similarly affected persons for disparate treatment, but rather rests on a 
proper and legitimate classification.
E. SCOTT PRUITT
Attorney General of Oklahoma
MITHUN MANSINGHANI
Deputy Solicitor General 

FOOTNOTES
[1] Section 570.10 was 
originally enacted in 1980 as 52 O.S.Supp.1980, § 540. As part of the 
Production Revenue Standards Act of 1992, which "provides a comprehensive 
regulatory structure governing how interest owners and operators work together 
at the wellhead, and serves to hold operators accountable to their interest 
owners," In re SemCrude, 407 B.R. at 154, the former Section 540 was 
rewritten and recodified as new Section 570.10. 1992 Okla. Sess. Laws ch. 190, § 
28. 
[2] For royalty proceeds from the sale of gas, proceeds 
after the initial distribution must be paid "not later than the last day of the 
third succeeding month after the end of the month within which such production 
is sold[,]" with some exceptions. Id. § 570.10(B)(2)(b). 
[3] "Marketability of title shall be determined in 
accordance with the then current title examination standards of the Oklahoma Bar 
Association." Id. § 570.10(D)(2)(a); see also Hull, 
1989 OK 168, ¶ 9, 789 P.2d at 1277. 

[4] Because this Opinion concerns the constitutionality of 
a statute, it should be considered advisory only. The Oklahoma Supreme Court 
"alone has the power to authoritatively determine the validity or invalidity of 
a statute." York v. Turpen, 1984 OK 26, ¶¶ 10-12, 681 P.2d 763, 767. 
[5] In 1985, the Legislature deleted from the statute the 
phrase "as the penalty," which originally appeared after the specification of 
the 12 percent rate. See 1985 Okla. Sess. Laws ch. 141, § 1; 
see also Fleet v. Sanguine, Ltd., 1993 OK 76, ¶ 5 n.14, 854 P.2d 892, 895 n.14. As a result, courts have 
recognized that Section 570.10(D) is no longer construed as a penalty for 
certain purposes, such as determining the statute of limitations for a claim for 
the 12 percent interest or deciding whether the 12% rate precludes a punitive 
damages award. See Purcell v. Santa Fe Minerals, Inc., 
1998 OK 45, ¶¶ 15-22 , 
961 P.2d 188, 192-93; Hebble v. 
Shell Western E & P, Inc., 2010 OK CIV APP 61, ¶ 22, 238 P.3d 939, 946. But it is clear from the text and 
history of the statute, which has seen its core provisions maintained despite 
several revisions, that the Legislature still intends that Section 570.10(D) 
promote timely distribution of proceeds to oil and gas interest owners. 
See Hull, 1989 OK 168, ¶ 14, 789 P.2d at 1279. Deletion of the 
phrase "as a penalty" does not change the purposes of and justifications for 
Section 570.10(D) and does not render it an irrational classification prohibited 
by Article V, Section 46. Mere removal of three words does not render the law 
unconstitutional.

 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
1994 OK CIV APP 185, 918 P.2d 397, 67 OBJ 2128, 
Oryx Energy Co. v. Plains Resources, Inc.
Discussed

 
2010 OK CIV APP 61, 238 P.3d 939, 
HEBBLE v. SHELL WESTERN E & P, INC.
Discussed

 
1981 OK CIV APP 40, 631 P.2d 1349, 
Cyrus v. Vierson & Cochran, Inc.
Discussed

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1986 OK 34, 725 P.2d 278, 57 OBJ 1485, 
Seal v. Corporation Com'n
Discussed

 
1988 OK 88, 760 P.2d 816, 59 OBJ 1987, 
Reynolds v. Porter
Discussed at Length

 
1989 OK 168, 789 P.2d 1272, 60 OBJ 2358, 
Hull v. Sun Refining and Marketing Co.
Discussed at Length

 
1993 OK 76, 854 P.2d 892, 64 OBJ 1847, 
Fleet v. Sanguine, Ltd.
Discussed

 
1909 OK 317, 109 P. 544, 25 Okla. 353, 
BURKS v. WALKER.
Discussed at Length

 
2006 OK 16, 133 P.3d 281, 
CITY OF ENID v. PUBLIC EMPLOYEES RELATIONS BOARD
Discussed at Length

 
2006 OK 98, 152 P.3d 861, 
ZEIER v. ZIMMER, INC.
Discussed

 
2008 OK 95, 196 P.3d 511, 
EOG RESOURCES MARKETING v. OKLAHOMA STATE BD. OF EQUALIZATION
Discussed

 
2010 OK 48, 237 P.3d 181, 
LAFALIER v. THE LEAD-IMPACTED COMMUNITIES RELOCATION ASSISTANCE TRUST
Discussed at Length

 
1980 OK 117, 621 P.2d 1142, 
Draper v. State
Discussed at Length

 
1951 OK 43, 228 P.2d 376, 204 Okla. 199, 
ADWON v. OKLAHOMA RETAIL GROCERS ASS'N
Discussed at Length

 
1998 OK 45, 961 P.2d 188, 69 OBJ 2127, 
PURCELL v. SANTE FE MINERALS, INC.
Discussed

 
1999 OK 53, 986 P.2d 1130, 70 OBJ 1820, 
State ex rel. Macy v. Board of County Commissioners
Discussed

 
1984 OK 26, 681 P.2d 763, 55 OBJ 1013, 
State ex rel. York v. Turpen
Discussed

Title 15. Contracts

 
Cite
Name
Level

 
15 O.S. 266, 
Legal and Contract Rates of Interest
Cited

Title 52. Oil and Gas

 
Cite
Name
Level

 
52 O.S. 540, 
Renumbered as 52 O.S. § 570.10 by Laws 1992, SB 168, c. 190, § 28
Cited

 
52 O.S. 570.10, 
Proceeds from Sale of Production
Discussed at Length