2012 OK CIV APP 69

**SUMMA ENGINEERING, INC.,**
Plaintiff/Appellant,

v.

**CRAWLEY PETROLEUM CORPORA-TION, and Mack Energy Compa-ny, Defendants/Appellees.**

No. 107,483.

Court of Civil Appeals of Oklahoma, Division No. 1.

July 7, 2011.

Rehearing Denied Aug. 11, 2011.

Certiorari Denied Nov. 14, 2011.

Phillip P. Owens II, Owens Law Office, P.C., Edmond, OK, for Plaintiff/Appellant.

Gary W. Catron, McAfee & Taft, a Professional Corporation, Oklahoma City, OK, for Defendants/Appellees.

WM. C. HETHERINGTON, JR., Presiding Judge.

¶1 Summa Engineering, Inc. (Summa) sued Crawley Petroleum Corporation (CPC) and Mack Energy Company (MEC, collectively Defendants) for breach of contract and negligence in drilling an oil well in Jackson County, Oklahoma. Summa appeals the trial court's judgment which sustained Defendants' demurrer to the evidence at the close of Summa's case and entered judgment in Defendants' favor. We AFFIRM.

## STANDARD OF REVIEW

¶2 When ruling on a demurrer by a defendant after the conclusion of the plaintiff's case in a legal action tried to the court, the trial court must not weigh the evidence but must accept as true all of the plaintiff's evidence and the reasonable inferences therefrom and disregard all conflicting evidence that is favorable to the defendant. *Barton v. Warren*, 2005 OK CIV APP 56, ¶2, 120 P.3d 484, 485. A demurrer must be denied if the opponent has established a prima facie case by producing competent evidence to support each material element of their cause of action. *Id.* However, a trial court's legal rulings are reviewed under a *de novo*, or non-deferential standard of review. *In re De–Annexation of Certain Real Property from City of Seminole*, 2009 OK 18, ¶7, 204 P.3d 87, 89.

## CASE FACTS

¶ 3 The facts in this case are mostly undisputed. William E. Jackson, an independent petroleum geologist, collaborated with R.L. Hilbun, a petroleum engineer and president of Summa, in the preparation of a "New Well Proposal" for the SW Eldorado Prospect (the Proposal), which covered several sections in Jackson County.[1] In early 2003, Jackson submitted the Proposal to MEC. In relevant part, the Proposal described the "current leasehold," the proposed area of mutual interest (AMI), the acreage cost and prospect fee, the total project costs, the delivered net revenue interest (NRI) of 79%, and the same NRI and $50/acre costs for future leases. The Proposal's general terms provided Summa "will be the operator," recommended a 3-D Seismic program prior to the final drill site selection, and listed six requirements, including run a sonic log suitable for seismic interpretation, the first well "is to be drilled on an unspaced lease basis and on the LeMaster lease" and "Jackson 1A and Jackson 2A wells will be retained by [Summa] as a well bore only (WBO) interest."

¶ 4 By letter to Jackson dated July 10, 2003, "[MEC] in partnership with [CPC]" explained they were interested "in pursuing [Summa's Prospect]." Defendants proposed "$16,000 for current leasehold," and two different percentages for overriding royalty interests (ORRI) and carried interest,[2] dependent on "if 1/8th leases" or "if 3/16th leases." They also proposed "3-D is at our option," the "[i]nitial well will be the re-entry of Jackson 2-A," the "[s]ubsequent well location to be determined by [Defendants], and $20/acre fee paid on all new leases outside current leasehold but within the 4-section AMI." They then stated, "[p]lease be assured MEC/CPC [will] diligently pursue the drilling of the initial test well as we are very interested in seeing this idea tested." The letter was signed by Chris Fowler, as MEC's Vice President of Exploration.

¶ 5 Jackson and Hilbun responded together by letter of the same date to MEC, stating "we offer the following refinement of your terms." They accepted Defendants' $16,000 offer for the current leasehold, but instead proposed delivery of a "1/6 lease" and "Summa will receive a 15% carry on the work-over and subsequent well" and "will receive $10,000 for the Jackson 2–A well and tank battery." As another new term, the offer proposed Mr. Jackson "will be assigned a 2.0833% ORRI on the lease delivered by [Summa]" and "will receive, on any new leases within the four section AMI, an ORRI equal to 0.80 minus the lease royalty but not exceeding 2.0833% and not be less than 0.5%." Jackson and Hilbun accepted Defendants' proposals for optional 3D seismic, payment of $20/acre fee on all new leases, and the "initial well will be the recompletion of the Jackson 2–A." They also conditionally agreed the "subsequent well location is [Defendants'] option *subject to* the letter agreement with Dale Borders," (emphasis added), explaining in a separate paragraph, "the present prospect is subject to a letter agreement with Dale Borders agreeing to drill the first well on the Lemaster lease. We will contact Mr. Borders and attempt to receive his approval to allow the work-over to be that first well." Both Hilbun and Jackson signed this letter.

¶ 6 By letter dated July 11, 2003, Fowler accepted on behalf of Defendants, Summa's offer to deliver "83.3333% (1/6th) lease," but modified its proposed 15% carried working interest (WI) by reducing such to "12.5% on the Jackson 2A re-entry and 10% limited to the first subsequent well thereafter." Although Defendants agreed to give the requested ORRI to Jackson, they modified Summa's offer by adding MEC would be retaining an 81.25% NRI, and in another

---

**1.** Sections 4 and 5–T2S–R24W, Sections 32 and 33–T1S–R24W in Jackson County, Oklahoma.

**2.** *See K & H Well Service, Inc. v. Tcina, Inc.,* 2002 OK 62, n. 3, 51 P.3d 1219, 1222, in which a party asserted it possessed only a "carried working interest," for which term the Court relied on *Mayfield v. H.B. Oil & Gas,* 1987 OK 106, 745 P.2d 732, 733, for the following definition:

A **carried interest** is a fractional interest in an oil and gas property, usually a lease, the holder of which has no personal obligation for operating costs, which are to be paid by the owner or owners of the remaining fraction, who reimburse themselves out of production, if any. The person advancing the cost is the carrying party and the other is the carried party.

provision, modified the amount of ORRI Jackson would receive for subsequent leases.

¶ 7 Phone conversations between the parties resulted in written changes to Defendants' typed July 11, 2003 letter. Summa's carried WI on the first subsequent well was increased from 10% to 12.5% and Jackson's ORRI on subsequent leases was again modified. The parties marked through Defendants' proposal allowing "subsequent well location to be determined by MEC" and left in a duplicate proposal allowing such determination by "MEC/CPC." Both Hilbun and Jackson initialed the changes.

¶ 8 Additional changes were made the same day. Using Defendants' typed July 11, 2003 letter, the parties modified the provision giving Summa a carried WI on the first subsequent well by writing "12.5 % CTCP* " next to it and adding an asterisk at the bottom of the page followed by the phrase "Carried To Casing Point." They also changed Jackson's ORRI for subsequent leases. All three changes were initialed by Hilbun and Jackson, and both signed their full names next to the handwritten word "Approved" at the bottom of the page ("the final July 11, 2003 Letter Agreement").[3]

¶ 9 On October 16, 2003, Hilbun executed, as President of Summa Engineering, Inc., an "Assignment Of Oil And Gas Leases and Bill of Sale," which conveyed "an undivided 50% interest each, unto [MEC] ... and [CPC]" in two separate leases in Jackson County and all of the equipment, chattels, and the two Jackson wells located on those leases. The Assignment and Bill of Sale expressly provides it "is subject to that certain letter agreement dated July 11, 2003" and "shall become effective July 30, 2003."

¶ 10 By letter dated May 26, 2004, CPC proposed drilling a horizontal well to MEC under the terms of their separate operating agreement and mailed Jackson a copy of the same letter. Jackson and Hilbun responded

by separate letters to CPC explaining, *inter alia,* their concerns the seismic depth may not be accurate and opined "the Jackson 3–A should be drilled vertically." A copy of each letter was mailed to MEC.

¶ 11 A horizontal well was subsequently drilled. On September 8, 2004, CPC notified Hilbun and MEC by letter, informing them a well had been drilled to a "total measured depth of 9,118' with the 4–3/4" hole section from 8,197' to 9,118' left uncased (hereinafter the casing point)" and it had "commenced completion operations on the well after reaching casing point." Noting "[Summa] has a 12.5% carried working interest to casing point in the Jackson A–3 Horizontal," CPC requested it to confirm "your election to participate in the after casing point operations and completion" of that well. It is undisputed Summa made no election. In a second letter with an AFE[4] attached, CPC thereafter proposed re-entering and deepening the Well by fifty feet and a second lateral drill to a specific depth, to which only Jackson responded and again recommended a vertical well.

¶ 12 In 2006, several years after the Well became productive, Summa sued Defendants for breach of contract and negligence. Defendants answered, admitting execution of an agreement with Summa, but denying its proposal was part of the same and claiming the horizontal well was drilled consistent with the terms of the agreement. Two years later Defendants' motion for summary judgment on both causes of action was overruled by the trial court.

¶ 13 The matter eventually proceeded to trial in July 2009, at the beginning of which each party admitted numerous exhibits, without objection from the other party. Hilbun testified during Summa's case-in-chief, as did Fowler, MEC's representative. After Summa rested, Defendants demurred to the evi-

---

**3.** We note for the record Mr. Hilbun did not sign this document or any prior letter as President of Summa. However, in an affidavit attached to Summa's response to Defendants' motion for summary judgment, Mr. Hilbun admitted he signed a letter on July 25, 2003 "refining the terms of and finalizing an agreement between Summa Engineering Inc. and [MEC]."

**4.** An AFE or Authority for Expenditure, or Authorization for Expenditure, is an authorization for expenditures for the well. *Schulte v. Apache Corp.,* 1995 OK 148, n. 1, 949 P.2d 291, 298.

dence, arguing a qualified proposal is a new proposal under 15 O.S.2001 § 71 and their response to the proposal "was more than qualified. It was *substantially* changed." Defendants also argued there was no requirement in the final agreement to drill either a vertical or additional well and "in a nutshell ... this is a contract case." They finally argued by virtue of the parties' agreement Defendants owned 100% of the leasehold interest and assumed 100% of the risk and cost of drilling the Well and were entitled to drill the well their way.

¶ 14 Summa opposed Defendants' demurrer, arguing under the evidence and testimony (1) "the negotiations were for changes to certain terms of the original proposal" and "even if you go back and forth, if you're substantially renewing your original proposal, then it's incorporated into it"; (2) the casing point was never reached "to the point you can look at evidence ... to make an educated determination ... to proceed further in the well"; and (3) Defendants "acted imprudently and, indeed, not in good faith in drilling the well" because they had been warned they were going to have a problem drilling a horizontal well. The trial court sustained Defendants' demurrer. Summa's appeal followed.

### ANALYSIS

¶ 15 In its appeal, Summa argues the trial court erred by sustaining Defendants' demurrer to the evidence on both of its causes of action. It first argues Defendants breached the final July 11, 2003 Letter Agreement "by drilling a horizontal well rather than a vertical well that was proposed and was the only type of well discussed between the parties." Summa contends its evidence establishes all three elements of a prima facie case of breach of contract, *i.e.*, formation of a contract, breach of the contract, and damages as a direct result of the breach.

■ ¶ 16 Both parties agree a contract was formed, but disagree about whether the final July 11, 2003 Letter Agreement included a requirement to drill a vertical well. Summa asserts the course of the parties' negotiations "coupled with the very nature of the marked-up, serially faxed sheet that [De-

fendants] contend is the sole and complete agreement between the parties" supports "the subsequent discussions resulted in renewals of [Summa's] original proposal." Defendants argue Summa's initial proposal, which the parties agree required the drilling of a vertical well, was rejected by Defendants' counteroffer and the subsequent offers, counteroffers, and the final July 11, 2003 Letter Agreement do not expressly or impliedly include that requirement.

¶ 17 We agree with Defendants. The language of a contract is to govern its interpretation. 15 O.S.2001 § 154. If the language of a contract is clear and free of ambiguity, the court is to interpret it as a matter of law, giving effect to the mutual intent of the parties at the time of contracting. *Pitco Production Co. v. Chaparral Energy, Inc.*, 2003 OK 5, ¶ 12, 63 P.3d 541, 545.

■ ¶ 18 "The consent of the parties to a contract must be: 1. Free, 2. Mutual, and 3. Communicated by each to the other." 15 O.S.2001 § 51. "Consent is not mutual unless the parties all agree upon the same thing in the same sense...." 15 O.S.2001 § 66. "An acceptance will not bind the offeror unless it is unconditional, identical to the offer, and does not modify, delete or introduce any new terms into the offer." *Ollie v. Rainbolt*, 1983 OK 79 ¶ 19, 669 P.2d 275, 280. An acceptance that modifies the terms of an offer is a counter offer and constitutes a rejection of the initial offer. *In re De-Annexation of Certain Real Property from City of Seminole*, 2009 OK 18, ¶ 9, 204 P.3d 87, 89.

¶ 19 Comparison of Summa's original proposal with Defendants' July 10, 2003 letter clearly reveals they offered new terms which completely changed the proposal and must be viewed as a rejection or counterproposal. Even Summa's response, which accepted a few of the counterproposal's new terms, included new and different terms. Neither these documents nor any subsequent document, including the final July 11, 2003 Letter Agreement, mention the original proposal, a vertical drilling requirement and there is no evidence it was renewed as initially proposed.

¶ 20 Renewal of an offer requires no change in the name of the parties, the subject matter, or the terms and conditions of the offer. *Anderson v. Garrison*, 1965 OK 72, 402 P.2d 873. Hilbun admitted to "substantial differences" between the original proposal and the final July 11, 2003 Letter Agreement, which testimony negates Summa's renewal argument. As a matter of law, the trial court properly sustained Defendants' demurrer to the evidence for this alleged breach of contract.

¶ 21 Summa further argues Defendants breached the contract by "improperly imposing a casing point election upon Appellant when no casing point had been reached, then unilaterally absorbing [Summa's carried working] interest in the well." Its main complaint is with Defendants' "unilateral determination" of the casing point election and *lack of* a casing point evaluation of the reservoir to make an educated determination. Considering the evidence in the light most favorable to it, Summa argues a reasonable finder of fact could have concluded "the event required for the casing point election never occurred, resulting in a breach of contract when [Defendants] required [Summa] to make the election, then 'absorbed' its working interest."

¶ 22 We disagree. First, under the evidence and testimony presented to the trial court, there are no restrictions, requirements or other duties required of Defendants as it relates to the casing point determination. Courts "cannot expand the contract to include obligations or rights which the parties themselves did not delineate." *ENI Producing Properties Program Ltd. Partnership 1982–I ex rel. Baytide Petroleum, Inc. v. Samson Inv. Co.*, 1999 OK 21, ¶ 11, 977 P.2d 1086, 1088.

¶ 23 Second, under their agreement, Defendants were owners of 100% of the working interest subject to the terms of the final July 11, 2003 Letter Agreement.[5] During direct examination, Hilbun testified, when Defendants notified Summa the casing point had been reached, he understood they were expecting Summa to pick up its share of the cost from that point forward. Before the next question was asked, Hilbun then admitted, "[w]e did have some evaluation ... of the method ... how the well was drilled and the samples and that sort of thing." He also admitted Summa did not respond or object to Defendants' casing point definition or to their requests to make an election. The trial court properly sustained Defendants' demurrer to the evidence for this alleged breach of contract.

¶ 24 Summa finally argues Defendants were negligent in drilling the horizontal well because they were warned ahead of time by Summa they would not hit the targeted zone. Although it cites authority for the three elements to establish negligence, the primary one being whether Defendants owed Summa a duty of care, Summa neither cites authority for its argument that Defendants "were held to the duty of a prudent operator as to [Summa], a working interest owner" nor argues how their letter agreement or relationship thereunder might give rise to such duty.[6]

¶ 25 In Oklahoma, the fiduciary duty owed by an operator to royalty owners and lessees is created by unitization order and agreement. *Leck v. Continental Oil Co.*, 1989 OK 173, 800 P.2d 224. There is no evidence a unit is involved in this case. Further, "[i]n Oklahoma, oil and gas well operators have no fiduciary duty to non-operators arising solely from contracts such as leases,

---

5. Regarding the parties' agreement, Mr. Hilbun testified he understood *if* Summa elected to participate in a subsequent well, it would thereafter be assigned 12.5% working interest by Defendants.

6. Following Defendants' argument there are no allegations of a fiduciary duty or any other special relationship, they rely on *J.E. Crosbie, Inc. v. King*, 1943 OK 14, 192 Okla. 53, 133 P.2d 543, for holding a managing agent of an oil and gas

venture is only required to act in good faith and with reasonable skill and diligence to support their position the evidence established they did. In its Reply Brief, Summa argues *Crosbie* is limited to "partnerships," and "is distinguishable from the present case, as there was no partnership here, and none was alleged." Because *Crosbie* actually involved a "mining partnership," we assume Summa is denying the existence of a "mining partnership."

communitization agreements, or joint operating agreements." *Hebble v. Shell Western E & P, Inc.*, 2010 OK CIV APP 61, ¶ 9, 238 P.3d 939, 943. "An operator's breach of duties under such agreements gives rise to a breach of contract claim, not a breach of fiduciary duty claim." *Tarrant v. Capstone Oil and Gas Co.*, 2008 OK CIV APP 17, ¶ 16, 178 P.3d 866, 871.

¶ 26 Assuming Defendants owed Summa a duty of care under the lease or letter agreement, there is no evidence that Defendants' decision to drill a horizontal well was made in bad faith or was performed negligently, unreasonably or without due diligence. To the contrary, Summa's own evidence established the horizontal well Defendants drilled was productive. The trial court's judgment sustaining Defendants' demurrer or "motion for directed verdict" is AFFIRMED.

BELL, C.J., and HANSEN, J., concur.